*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TOM SEEGER,

          *Plaintiff-Appellant,*

      *v.*

CINCINNATI BELL TELEPHONE COMPANY,
LLC,

          *Defendant-Appellee.*

No. 10-6148

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 08-00207—David L. Bunning, District Judge.

Argued: January 11, 2012

Decided and Filed: May 8, 2012

Before: SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Sheila M. Smith, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellant. Nathaniel Lampley, Jr., VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Sheila M. Smith, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellant. Nathaniel Lampley, Jr., VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellee.

      GRIFFIN, J., delivered the opinion of the court, in which SILER, J., joined. TARNOW, D. J. (pp. 20–24), delivered a separate dissenting opinion.

---

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

1

––––––––––––––––

**OPINION**

––––––––––––––––

GRIFFIN, Circuit Judge.  Plaintiff Tom Seeger appeals the district court's order granting summary judgment in favor of defendant Cincinnati Bell Telephone Co., LLC ("CBT"), and dismissing his claim that CBT violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, when it terminated his employment on the ground of disability fraud.  Seeger took FMLA leave and concurrent paid leave under CBT's own disability plan to treat and recover from a herniated disc in his back.  CBT terminated him for disability fraud after Seeger's co-workers saw him at the Oktoberfest in downtown Cincinnati during his FMLA leave period.

The district court held that, although Seeger established a prima facie case of retaliatory discharge, CBT's unrebutted honest belief that Seeger committed disability fraud shielded it from liability.  We agree and affirm.

I.

Tom Seeger was employed as a network technician by CBT from September 1979 through October 2007.  He was a member of a collective bargaining unit represented by the Communications Workers of America (the "Union").  CBT and the Union entered into a collective bargaining agreement ("CBA") that governed the terms and conditions of employment for CBT's network technicians, including Seeger.  Under the CBA, CBT employees who were on FMLA leave were also eligible to receive paid disability leave pursuant to CBT's Sickness and Accident Disability Plan.  The two benefits were separate and distinct – an employee who qualified for FMLA leave might not be eligible for paid disability leave, and vice versa.  CBT's paid disability plan imposed two additional requirements on employees beyond those in the FMLA:  (1) the employee must allow CBT to have access to his or her medical records for review by CBT, and (2) the employee was required to work in a modified or light-duty position

tailored to meet the individual's needs and medical restrictions, if the employee was medically able to do so.

Seeger's relevant medical issues began on August 20, 2007, when he experienced pain and numbness in his left leg. He went to the emergency room, where he was prescribed pain medications. Three days later, he sought follow-up care at the office of his primary-care physician, Dr. Michael Grainger. One of Dr. Grainger's colleagues administered a steroid injection and a muscle relaxer. From August 20 through August 26, Seeger was on an approved FMLA leave. Seeger returned to work on September 4, but his leg pain persisted. The following day, he was seen again by a physician at Dr. Grainger's office. An MRI confirmed that Seeger suffered from a herniated lumbar disc at L4-5 and L5-S1. Seeger was referred to a neurosurgeon at the Mayfield Clinic for surgical and pain management consultations.

On September 5, Seeger commenced a leave of absence, which was approved as both FMLA leave and paid disability leave by Theresa Greenwald, a registered nurse and the manager of CBT's Medical Department. Greenwald had over thirty-five years of experience, and she was certified in rehabilitation nursing and case management. In her position with CBT, Greenwald made the ultimate determinations regarding whether to approve or disapprove medical leave for CBT employees, and whether such leave qualified as FMLA or paid disability leave.

In the initial intake information that Seeger provided to the Mayfield Clinic, he reported left-leg numbness and intermittent lower-back and hip pain. He rated his pain level as 10 on a scale of 0 to 10 (with 10 being the worst), but stated that the pain improved when he was lying down. His neurosurgeon recommended physical therapy and an epidural steroid injection consultation with another specialist.

Seeger started a course of physical therapy, which consisted of three therapy sessions per week for four weeks, spanning from September 17 through October 12. At his first physical therapy session on September 17, Seeger reported that his level of pain had decreased, but he indicated that he could only sit or stand for thirty-minute intervals. On the same day, Greenwald wrote to Dr. Grainger, informing him that "[s]ince no

surgery is imminent and [Seeger] has been off work almost three weeks receiving non-surgical care, we could provide part-time sedentary telephone work for Mr. Seeger. Please consider this temporary restricted duty." In her correspondence, Greenwald further explained that employees on restricted duty are not required to work full time and such work may involve as few as two hours a day.

Dr. Grainger examined Seeger on September 19, 2007. Seeger complained of pain in his lower back and numbness in his left leg. Dr. Grainger observed that Seeger had difficulty changing positions, getting in and out of a chair, and walking. Based upon his symptoms, Grainger estimated that Seeger's pain level was at 7 or 8 on the 1 to 10 scale. Dr. Grainger diagnosed Seeger with left sciatica and lumbar radiculopathy caused by Seeger's herniated disc. According to Dr. Grainger, the pain from this condition could vary considerably during a twenty-four hour period, even after an epidural steroid injection. The treatment goal for Seeger was increased activity. Dr. Grainger instructed Seeger to continue physical therapy, engage in tolerable physical activity, and confer with the neurosurgeons at the Mayfield Clinic. In his notes recording this office visit, Dr. Grainger wrote "no work" for Seeger. The next day, in response to Greenwald's earlier inquiry, Dr. Grainger's physician's assistant left a voicemail message for Greenwald indicating that Seeger was unable to perform any restricted work. Seeger therefore continued to receive paid leave and was not required to perform light-duty work.

Four days later, on September 23, Seeger and his wife Rose attended the Oktoberfest in downtown Cincinnati for approximately ninety minutes, during which time Seeger admittedly walked a total of ten blocks to and from the festival and consumed one or two beers. There, they had separate chance encounters with several co-workers. They chatted with Michael Caplinger for fifteen minutes. Caplinger only witnessed Seeger walking a few steps in the opposite direction after their conversation ended. Glen Adkins, a CBT transportation engineer, also saw Seeger at the Oktoberfest – first while Seeger was talking to Caplinger and later when Seeger was walking, seemingly unimpaired, for approximately fifty to seventy-five feet through the crowd.

Two other CBT employees – Larry Curless and James Schulten – also saw Seeger at Oktoberfest. Curless noted that Seeger "appeared to be in a lot of pain" because his steps off the curb were very labored. Seeger told Schulten that his back was bothering him so he had to go home.[1]

Adkins was aware that Seeger was on disability leave and reported his sighting of Seeger to Tracy Wilson, CBT's Human Resources Manager.[2] Wilson instructed Adkins to send his observations in an e-mail. Adkins sent the e-mail to Wilson on September 25, and Wilson eventually forwarded it to his supervisor, Michelle Simpson, Director of Employee Relations and Recruiting.

On September 26, Greenwald called Seeger to discuss his health status. Seeger told her that he still suffered from shooting pain and altered sensation in his left leg, and that he had good and bad days. Seeger advised Greenwald that he had been to five physical therapy sessions and had scheduled a pain-management consultation with one of the physicians at the Mayfield Clinic. The next day, at his Mayfield Clinic appointment, Seeger complained of numbness radiating down his left leg and difficulty walking. He received the first of two epidural steroid injections.

On October 3, Seeger saw Dr. Grainger again and reported that his pain and range of motion had improved following the injection. Seeger told Dr. Grainger that he wanted to return to work, but according to Seeger, Dr. Grainger would not allow it. On October 4, Seeger called Greenwald and updated her as to his medical progress. Greenwald did not bring up the topic of light-duty work with Seeger during either this conversation or the previous one on September 26. On October 11, Seeger had a second

---

[1]Although Seeger proffered the affidavits of Curless and Schulten in his response to CBT's motion for summary judgment filed in this case, he never mentioned these two witnesses to CBT during the course of its disability fraud investigation.

[2]Adkins and the Seegers did not have a good working relationship. In January 2007, Seeger's wife Rose, also an employee of CBT, filed a grievance against Adkins alleging that he was doing tasks reserved only for union members. In June 2007, Seeger complained to his supervisors that Adkins was creating a hostile work environment for Seeger and Rose.

injection, followed by a physical therapy session the next day. On October 15,[3] Seeger had another appointment with Dr. Grainger and reported that he had been asymptomatic for two days. Dr. Grainger authorized his return to work, and Seeger resumed his full-time position as a CBT network technician on October 16, 2007.

In the meantime, upon hearing of Seeger's attendance at Oktoberfest, Simpson instructed Wilson to investigate Adkins' report. Wilson interviewed Caplinger and forwarded his notes of the meeting to Simpson. CBT obtained sworn statements from Caplinger and Adkins regarding their contact with Seeger at Oktoberfest. In their affidavits, Caplinger and Adkins stated that they saw Seeger drinking a beer and "walking unassisted and seemingly unimpaired through the crowded festival." Adkins said that Seeger "did not appear to be impaired or disabled."

Simpson independently reviewed Seeger's medical records, disability file, and employment history. She consulted with Greenwald about Seeger's medical issues, but neither Simpson nor Greenwald directly contacted Seeger's treating physicians to discuss his medical condition. Based upon perceived inconsistencies between Seeger's reported medical condition and his behavior at Oktoberfest, Simpson decided to suspend Seeger's employment and instructed Wilson to schedule a suspension meeting, which was held on October 31, 2007.

At the meeting, Wilson questioned Seeger about the details of his back injury and why he was able to attend Oktoberfest, yet he was unable to perform light-duty work pursuant to CBT's paid-leave policy. Seeger explained his treatment regimen to Wilson and told him that it was Dr. Grainger's decision that he should not perform any light-duty work. Because Seeger did not know what the light-duty assignment might entail, he did not question the doctor's assessment. He defended his actions and denied committing disability fraud. Nonetheless, at the conclusion of the meeting, Wilson suspended Seeger pending the completion of CBT's investigation and invited Seeger to

---

[3]There is some dispute as to whether Seeger saw Dr. Grainger on October 12 or October 15, or both.

submit any information that might be relevant to the inquiry.  Seeger thereafter provided a letter dated October 31, 2007, from Dr. Grainger, which stated:

> Walking for one and a half hours at one's own pace doesn't equal working for an eight hour day nor is it reasonable to assume that he could perform even limited duties for an eight hour day.  Most patients with herniated discs are most comfortable standing and/or walking but [are] unable to sit or change positions.

In addition, Seeger provided his own written statement in which he explained that

> I have tried to do everything in my power to satisfy the documented needs of [CBT's] medical [department] and so has my doctor.  As far as the time in question I saw my doctor on [October] 19th and had 2 therapy sessions between that day and the day I went to Octoberfest.  It is true I went to Octoberfest for about an hour, to get out of the house and walk around.  I was in pain the whole time, but did get some relief when I took short walks.  My doctor specifically told me that walking was good for my condition and I tried to take short walks.  He specified no working, lifting or even seated work, since being seated put increased pressure on my low back and caused me additional pain.  I mostly stood or laid on the floor through my whole disability.  On two [occasions] I discussed with my doctor about the option of returning to work due to the perceived pressure of [CBT's] medical [department].  He said absolutely not.  When I had my steroid injection on 8/23 I came right back to work.  A week later when the pain returned the doctor said I could not return to work . . . .  I still have pain and do daily physical therapy at home.  I have been under my doctor['s] care since day one.  No one knows what kind of pain I am in but me, not a nurse who has ever examined me nor two people on the street who [only] saw me for a few minutes.

Simpson considered the letters from Seeger and Dr. Grainger, the written statements of Adkins and Caplinger, additional information submitted by the Union, and Seeger's medical records.  Based upon the information compiled in the investigation and after further review of Seeger's disability file with Greenwald, Simpson concluded that Seeger had "over reported" his symptoms in order to avoid the part-time light-duty work called for in the paid-leave policy.  In her opinion,

> Tom Seeger had reported himself in excruciating pain and reported difficulty changing positions and ambulating to the extent where, when we inquired about him being able to do a light duty-type position, the

doctor responded, "No work." Yet, he was seen by two independent witnesses walking around Oktoberfest where it's a crowded venue, and not easily accessed. I thought that . . . was fraudulent on his part. To report excruciating pain and difficulty walking, yet attending Oktoberfest [only days later].

On November 8, 2007, Simpson terminated Seeger's employment on the ground of disability fraud, a violation of CBT's code of conduct. The termination was effective October 31, 2007, the date of Seeger's suspension.

Ultimately, Greenwald approved Seeger for paid disability leave from September 5 until September 24, including the additional date of September 27, when Seeger received his first steroid injection. She approved Seeger for unpaid FMLA leave from September 24 until October 16, 2007.

On November 5, 2008, Seeger filed the present action against CBT, alleging age discrimination contrary to federal and Kentucky law, and a violation of his rights under the FMLA.[4] In February 2010, CBT filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c). Although Seeger opposed the motion with respect to his FMLA claims, he did not challenge CBT's motion as it pertained to his age discrimination claims. Following oral argument, the district court granted summary judgment in favor of CBT on all counts.

In its written decision addressing Seeger's FMLA claims, the district court found that because plaintiff "ma[de] no distinction between his retaliation and interference claims, . . . the Court will address both claims under the retaliation theory." Analyzing Seeger's claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court held that the close temporal proximity between Seeger's FMLA leave and his termination provided a sufficient causal

---

[4]On the day Seeger's employment was terminated, his Union filed a grievance contesting his discharge and the matter was submitted to arbitration pursuant to the terms of the CBA. On July 15, 2010, after a hearing on the matter, the arbitrator issued a written opinion finding that Seeger was terminated without just cause. The arbitrator denied reinstatement because Seeger had accepted a retirement package, but awarded him back pay for a six-month period between October 31, 2007, and April 30, 2008.

connection to establish a prima facie case of retaliatory discharge.[5]  However, the court further held that CBT articulated a legitimate, nondiscriminatory reason for terminating Seeger – disability fraud – and Seeger, in turn, failed to show that this reason was pretextual in nature.  Specifically, the district court held that Seeger failed to refute CBT's evidence that it had an "honest belief" in its nondiscriminatory basis for Seeger's termination.  The court therefore granted CBT's motion for summary judgment on Seeger's FMLA claim and dismissed the case with prejudice.  Seeger now timely appeals.

II.

We review the district court's grant of summary judgment de novo.  *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 690 (6th Cir. 2009).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Id*. (quoting Fed. R. Civ. P. 56(c)).  "In evaluating summary judgment, we must view all the facts and the inferences drawn from it in the light most favorable to the nonmoving party."  *Daugherty*, 544 F.3d at 702.  "The 'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)) (emphasis in original). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id*. (citation and internal quotation marks omitted).

The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.'"

---

[5]CBT did not dispute the other two necessary elements of a prima facie case, i.e., that Seeger engaged in a statutorily protected activity and that he suffered an adverse employment action.  *See generally Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).  CBT did, however, argue that Seeger lacked any evidence of retaliatory intent.

*Arban v. West Publ'g Corp*., 345 F.3d 390, 400 (6th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Upon returning from FMLA leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1).

The FMLA does not preclude employers from offering employees paid medical-leave benefits in tandem with FMLA unpaid leave; in fact, an employer may require an eligible employee to substitute accrued paid leave for unpaid FMLA leave, with such paid leave to run concurrently with the FMLA leave. *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 393 (6th Cir. 2009) (citing 29 C.F.R. § 825.207(a)). "'If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave.'" *Id*. (quoting 29 C.F.R. § 825.207(a)).

The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2). Consistent with these proscriptions, "[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

As a preliminary matter, Seeger contends that the district court erred when it found the FMLA retaliation and interference claims alleged in his complaint to be indistinguishable and thus analyzed them solely as an FMLA retaliation claim under § 2615(a)(2). We disagree.

Our court has recognized two discrete theories of recovery under the FMLA: (1) the so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2). *Hunter*, 579 F.3d at 691; *Arban*, 345 F.3d at 400-01. Although we have held that a claim for

retaliatory discharge is cognizable under either theory,[6] the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Arban*, 345 F.3d at 401. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted). In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.*

Generally, "a plaintiff ha[s] not waived a claim based on the interference theory where the complaint alleged general violations of 29 U.S.C. § 2615 that could apply to both interference and retaliation claims." *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 335 (6th Cir. 2009) (citing *Wysong*, 503 F.3d at 446). However, the essence of Seeger's claim is retaliation, not interference with his substantive FMLA rights. In analogous circumstances, the Eighth Circuit Court of Appeals has convincingly rejected the same argument made by Seeger. In *Stallings v. Hussmann Corp.*, 447 F.3d 1041 (8th Cir. 2006), the employer terminated the plaintiff (Stallings) for "calling in FMLA [leave] for non-FMLA reasons, fraudulent . . . misuse of the leave of absence policy, . . . and causing falsification of the company's records in this regard." *Id.* at 1045. Stallings filed an action alleging, inter alia, both FMLA interference and retaliation claims, but the district court granted summary judgment in favor of the employer. *Id.* On appeal, Stallings argued that the district court improperly consolidated his FMLA claims and considered them as one for retaliation under § 2615(a)(2). *Id.* at 1050. The Eighth Circuit disagreed, stating:

---

[6]*See Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 815 (6th Cir. 2009); *Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 400-01 (6th Cir. 2008); *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446-47 & n.2 (6th Cir. 2007); *Arban*, 345 F.3d at 403; *Chandler v. Specialty Tire of Am. (Tenn.), Inc.*, 283 F.3d 818, 825 (6th Cir. 2002).

> In the present case, we conclude that the district court did not improperly analyze Stalling's FMLA claim as one of retaliation instead of interference.  First, [the defendant corporation] granted every request Stallings made to take FMLA leave; therefore, Stallings has failed to establish that [the defendant corporation and the defendant manager] denied him a benefit to which he was entitled because he received all of the FMLA leave he requested. . . .  Second, neither [defendant] ever impeded Stallings' use of FMLA leave.  Third, only after Stallings returned from FMLA leave did [the defendant corporation] question whether Stallings fraudulently used his FMLA leave and fire Stallings.  Therefore, Stalling's claim is fundamentally a claim for retaliation and should be analyzed as such.

*Id*. at 1051.

We find the reasoning of the Eighth Circuit to be persuasive and applicable to Seeger's case.  Although Seeger was denied some paid leave, he, like Stallings, received all of the FMLA leave to which he was entitled.  His FMLA leave request was approved in full by Greenwald, and Seeger returned to work on October 16, the date certified by Dr. Grainger, at which time he was reinstated by CBT to his former position as a network technician.  He resumed his normal work routine until he was terminated on November 8, 2007.  Consequently, CBT did not shortchange his leave time, deny reinstatement, or otherwise interfere with his substantive FMLA rights.  *See Arban*, 345 F.3d at 401 ("The issue [under the interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve week leave or reinstatement after taking a medical leave.") (citation and internal quotation marks omitted); *cf. Culpepper v. BlueCross BlueShield of Tenn., Inc*., 321 F. App'x 491, 496 (6th Cir. 2009) ("[The plaintiff's] FMLA [interference] claim . . . must fail.  Culpepper received exactly what her doctor ordered – six days of FMLA leave.  No additional leave was authorized by the Certification, and Culpepper has not shown that the five [unexcused] absences at issue were taken for one of the reasons enumerated in the FMLA.").  We therefore conclude that the district court did not err in confining its analysis of Seeger's FMLA claim to the retaliation theory of § 2615(a)(2).

Where, as here, Seeger sets forth an FMLA claim based on circumstantial evidence alleging a single motive for discrimination, it is evaluated under the familiar

*McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012); *Hunter*, 579 F.3d at 692 n.2. To establish a prima facie case of retaliation under the FMLA, Seeger must show that: (1) he was engaged in a statutorily protected activity; (2) CBT knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Donald*, 667 F.3d at 761. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

The parties dispute only the fourth criterion – the causal link connecting Seeger's FMLA leave to his termination. We agree with the district court that the nearness in time between Seeger's return from FMLA leave and his termination – three weeks after his reinstatement and less than two months after he first notified CBT of his medical leave – suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge. Seeger's termination followed on the heels of CBT's investigation, which commenced during Seeger's FMLA leave. "[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *see also Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (per curiam) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that the three-month

time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage).  Here, Seeger has shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation.

We further agree with the district court that at the next step of the *McDonnell Douglas* analysis, CBT has articulated a legitimate, nondiscriminatory reason for discharging Seeger.  *Bryson*, 498 F.3d at 570.  "'*Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.*'" *Allen*, 331 F. App'x at 395 (emphasis added) (quoting *Callison v. City of Phila.*, 430 F.3d 117, 121 (3d Cir. 2005)).  Fraud and dishonesty constitute lawful, non-retaliatory bases for termination.  *See Bentley v. Orange Cnty., Fla.*, 445 F. App'x 306, 309-10 (11th Cir. 2011) (affirming summary judgment in favor of the defendant employer where the plaintiff failed to show that the defendant's legitimate reasons for firing her – fraud and dishonesty, and violating the leave policy – were more likely motivated by her use of FMLA leave or lacking credibility); *Weimer*, 356 F. App'x at 818 ("Honda presented evidence from which the jury could have found that Weimer lied to company physicians about his activities at home while on leave, as well as about his medical symptoms.  If the jury did find that Weimer made such misrepresentations, they could then conclude that Honda terminated him for the legitimate reason of violating Honda's Standards of Conduct, and not for taking FMLA leave."); *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir. 2006) ("Defendant argues that it terminated Plaintiff pursuant to its dishonesty policy for mailing packages without paying for them.  This is a legitimate reason to terminate Plaintiff because it is legally sufficient to justify a judgment for Defendant.").

Moreover, an employee on FMLA leave may be terminated for violating the more stringent requirements of a concurrent paid leave policy, as long as that policy is reasonable and "neither conflicts with nor diminishes the protections guaranteed by the FMLA."  *Allen*, 331 F. App'x at 396 (holding that an employer did not violate the FMLA in terminating its employee who violated a "last chance agreement" by his failure

to abide by the collective bargaining agreement's call-in policy and his improper use of flex time).

CBT rightfully considered workplace disability fraud to be a serious issue. According to Simpson, CBT previously had terminated other employees for disability fraud. In policing this workplace problem, CBT's termination of Seeger because of his alleged dishonesty in over-reporting his symptoms to avoid the reasonable light-duty work requirement and continue to receive paid leave constituted a non-retaliatory basis for his discharge.

Having rebutted the presumption of discrimination raised by Seeger's prima facie case, the question remains whether, under the burden-shifting framework of *McDonnell Douglas*, Seeger then produced adequate evidence demonstrating that CBT's proffered reason was a pretext for discrimination. *Bryson*, 498 F.3d at 570. "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases and quotation marks omitted).

Unlike its role in establishing a prima facie case, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald*, 667 F.3d at 763. However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted). A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Clark*, 424 F. App'x at 474 (citation and internal quotation marks omitted). Seeger seeks to demonstrate pretext by means of the first method – no basis in fact – which is

essentially an attack on the credibility of the employer's proffered reason
. . . [and] consists of showing that the employer did not actually have
cause to take adverse action against the employee based on its proffered
reason, and thus, that the proffered reason is pretextual.  Where the
employer can demonstrate an honest belief in its proffered reason,
however, the inference of pretext is not warranted.  Thus, this Circuit has
adopted the "honest belief rule."  Under [this] rule, an employer's
proffered reason is considered honestly held where the employer can
establish it reasonably reli[ed] on particularized facts that were before it
at the time the decision was made.  Thereafter, the burden is on the
plaintiff to demonstrate that the employer's belief was not honestly held.
An employee's bare assertion that the employer's proffered reason has
no basis in fact is insufficient to call an employer's honest belief into
question, and fails to create a genuine issue of material fact.

*Joostberns*, 166 F. App'x at 791 (citations and internal quotation marks omitted).

The ground rules for application of the honest belief rule are clear.  A plaintiff
is required to show "more than a dispute over the facts upon which the discharge was
based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).  We have not
required that the employer's decision-making process under scrutiny "be optimal or that
it left no stone unturned.  Rather, the key inquiry is whether the employer made a
reasonably informed and considered decision before taking an adverse employment
action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  Furthermore, "the
falsity of [a] [d]efendant's reason for terminating [a] plaintiff cannot establish pretext
as a matter of law" under the honest belief rule.  *Joostberns*, 166 F. App'x at 794
(footnote omitted).  As long as the employer held an honest belief in its proffered reason,
"the employee cannot establish pretext even if the employer's reason is ultimately found
to be mistaken, foolish, trivial, or baseless." *Smith*, 155 F.3d at 806; *see also Majewski
v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

An employer's invocation of the honest belief rule does not automatically shield
it, because the employee must be afforded the opportunity to produce evidence to the
contrary, such as an error on the part of the employer that is "too obvious to be
unintentional." *Smith*, 155 F.3d at 807 (citations and internal quotation marks omitted).

CBT contends, and the district court agreed, that it has shown that it reasonably relied upon particularized facts in determining that Seeger committed disability fraud and, therefore, given Seeger's lack of evidence disputing its honest belief, summary judgment in its favor was appropriate. Viewing the evidence in the light most favorable to Seeger, we, too, conclude that CBT made a "reasonably informed and considered decision" before it terminated him, and Seeger has failed to show that CBT's decision-making process was "unworthy of credence." *Id.* at 808.

In arguing that CBT's reason for termination was pretextual, Seeger contends that CBT willfully ignored medical evidence in its possession that he was responding to treatment and his pain level had improved well before he attended Oktoberfest. He maintains that CBT should have gleaned from his medical records available at the time of the investigation that: (1) he was in pain, although it was lessening due to the steroid injection, prednisone, and physical therapy sessions; (2) further physical therapy was expected to provide further relief from pain; (3) consistent with the fluctuating nature of sciatica described by Dr. Grainger, although his sitting and standing tolerance was limited, he felt better when walking; (4) his condition had improved by the time he attended Oktoberfest due to the three intervening physical therapy sessions between September 17 and September 23; (4) Dr. Grainger specified "no work" on September 19; (5) he was a good employee, with no disciplinary infractions during his 28-year career with CBT, and he reported to Dr. Grainger that he was anxious to return to work; and (6) the long-term goal was to reduce his radiculopathy to zero within four weeks, allowing him to return to work without restrictions. Seeger also takes issue with the fact that neither Greenwald nor Simpson sought clarification of his medical condition from his treating physicians or proposed that he should be evaluated by a different doctor.

However, as we have already noted, an "optimal" investigation – i.e., interviewing the employee and some or all of his witnesses – is not a prerequisite to application of the honest belief rule. *Smith*, 155 F.3d at 807; *McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 444 (6th Cir. 2006). Further, the fact that Seeger was a reliable employee with a good employment record is not relevant, "as it proves no

more than that absent any misconduct on [Seeger's] part, [CBT] was unlikely to terminate his employment." *McConnell*, 198 F. App'x at 443.

Seeger's argument and presentation of competing facts is misdirected because it does not question CBT's investigatory process. The determinative question is not whether Seeger actually committed fraud, but whether CBT reasonably and honestly believed that he did. *Weimer*, 356 F. App'x at 818.

CBT never disputed that Seeger suffered from a herniated disc and sciatica. Yet Seeger's reports of excruciating pain on September 13, his inability to stand for more than thirty minutes on September 17, his difficulty ambulating on September 19, and Dr. Grainger's communication to Greenwald on that very same day that Seeger was unable to perform sedentary light-duty work, stood in stark contrast to Seeger's seemingly unimpaired appearance at Oktoberfest on September 23. While at Oktoberfest, he spoke to co-workers and drank a beer or two without any indication that his movements were painful or restricted. Seeger's ability to walk unaided for ten blocks and remain at the crowded festival for ninety minutes understandably raised a red flag for CBT, giving it reason to suspect that Seeger was misrepresenting his medical condition in an attempt to defraud CBT's paid-leave policy.

CBT's investigation was thorough. It interviewed Caplinger and Adkins and took their formal statements. Simpson, who was unaware of Seeger's FMLA leave of absence until Wilson's report reached her desk, scrutinized Seeger's medical records with the assistance of Greenwald, whose long-term experience as a nurse allowed her to put the records into context. Simpson reasonably requested documentation from Seeger and, before concluding her inquiry, gave him the opportunity to submit additional relevant information. While Dr. Grainger's October 31 brief letter to CBT contained general comments about Seeger's inability to work an eight-hour day, it did not confirm that Seeger was unable to work a light-duty schedule. Simpson perused the medical records from Dr. Grainger, the Mayfield Clinic, the Kentucky Diagnosis Center which performed the MRI, and the physical therapists. She testified that she had all of the

medical facts she needed, and therefore had no need to contact any of Seeger's medical providers for clarification of any points.

All in all, the record reflects that CBT made a reasonably informed and considered decision before terminating Seeger. That Seeger or the court might have come to a different conclusion if they had conducted the investigation is immaterial. Seeger has not refuted CBT's honest belief that the inconsistent facts before it were the result of fraud on his part, and his claim that his termination was a pretext for discrimination necessarily fails. We therefore conclude that the district court did not err in granting summary judgment in CBT's favor.

### III.

For the foregoing reasons, we affirm the judgment of the district court.

---

**DISSENT**

---

TARNOW, Senior District Judge, dissenting.  I cannot agree with the majority's conclusion that Appellee Cincinnati Bell has established its right to judgment as a matter of law.  Taking the facts in the light most favorable to Appellant, a reasonable jury could conclude that Appellee's given reason for firing Appellant was pretextual and was not an "honest belief."  There is therefore a genuine issue of material fact, and summary judgment for Appellee is inappropriate.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 690 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)).  The function of the court in examining a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Further, "[i]n evaluating summary judgment, we must view all the facts and the inferences drawn from it in the light most favorable to the nonmoving party." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Thus, summary judgment is only appropriate if, viewing all facts and inferences drawn from them in the light most favorable to the nonmoving party, the nonmoving party has failed to present "sufficient evidence to permit a reasonable jury" to find in the nonmoving party's favor. *Lindsay v. Yates*, 578 F.3d 407, 416 (6th Cir. 2009).  If a reasonable jury could find for the non-moving party, summary judgment is "inappropriate." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  Here, the majority concludes that no reasonable jury could find that Appellee's stated reason for firing Appellant was pretextual.

The majority focuses on the "honest belief" rule, that is, that an employer's honestly-held belief that it has a legitimate and non-discriminatory reason for firing a person is sufficient, even if the factual basis of said belief is later shown to be false. While this Court does not require that an investigation "be optimal or that it left no stone

unturned," *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998), an employer must demonstrate that it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). When an employer's decision-making process is "unworthy of credence," or where error on the part of the employer is "too obvious to be unintentional," reliance on such a process does not constitute an "honest belief." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998).

In the summary judgment context as it relates to the "honest belief" rule, the court should look to determine whether "sufficient evidence [exists] to permit a reasonable jury" to find that the employer did not have an "honest belief" based on an investigation that is "unworthy of credence." If "the evidence is susceptible of different interpretations or inferences by the trier of fact," summary judgment is "inappropriate." *Cockrel*, 270 F.3d at 1056. Thus, whether the court finds "that CBT made a reasonably informed and considered decision before terminating Seeger" is immaterial. The proper question is whether a reasonable jury could have concluded that Appellee's investigation was "unworthy of credence."

Appellee's only reason for its purported "honest belief" that Appellant engaged in disability fraud are the statements of two fellow employees who say they saw Appellant walking for approximately fifty to seventy-five feet. In Appellant's favor are the statements of other employees who said Appellant was in extreme pain while walking, the statements of Appellant's treating physician, and the undisputed medical evidence that Appellant was suffering from a condition that would have caused him to be unable to work but was ameliorated by physical exercise such as walking. Despite possessing all of this evidence, Appellee chose to neither consult an independent medical expert nor even to consult Appellant's physician prior to its decision to suspend and then fire him.

In this case Appellee focused on isolated and flimsy evidence while ignoring strong contrary evidence. Additionally, Appellee took no steps to obtain easily accessible information that would have helped Appellee arrive at an informed decision.

While this Court does not require that an investigation "be optimal or that it left no stone unturned," the lackluster nature of Appellee's investigation strains the bounds of credulity. Moreover, at the summary judgment stage the question is not whether Appellee's investigation was, in fact, "unworthy of credence," but whether a reasonable jury could have come to such a conclusion

> The following facts can be said to fall in Appellant's favor, and are undisputed:
>
> a.    Plaintiff was diagnosed with a herniated disc, sciatica, and lumbar radiculopathy.
>
> b.    Appellee approved Appellant for FMLA and disability leave based on medical evidence he presented to Theresa Greenwald, manager of Appellee's Medical Department and a Registered Nurse.
>
> c.    Prior to attending Oktoberfest, Appellant had several physical therapy sessions.
>
> d.    On September 19, Appellant was instructed by Dr. Grainger, his treating physician, to engage in increased physical activity as part of his treatment. Dr. Grainger observed that Appellant had difficulty getting in and out of a chair, changing positions, and walking. In his notes, Dr. Grainger concluded that Appellant should engage in "no work."
>
> e.    On September 20, Dr. Grainger called Theresa Greenwald and left a message indicating that Plaintiff was unable to perform even restricted work.
>
> f.    A CBT employee who saw Appellant at Oktoberfest, Larry Curless, said Appellant "appeared to be in a lot of pain."
>
> g.    Dr. Grainger, in a letter provided to Appellee by Appellant after his suspension, stated that walking for one-and-a-half hours was not equivalent to working an eight-hour day of even limited work and that

many patients with herniated discs were more comfortable standing or walking than sitting.

h.    Various additional medical evidence existed and was available to Appellee. However, Appellee did not contact Appellant's treating physician, and confined its investigation to reviewing the medical evidence it already possessed (and upon which FMLA and disability leave had been granted), his employment history (which was excellent), and the statements of persons who saw Appellant at Oktoberfest.

The following facts constitute the evidence that support Defendant's "honest belief" that Plaintiff engaged in disability fraud:

a.    On September 23, Appellant walked a total of ten blocks to and from the Oktoberfest festival in downtown Cincinnati, and remained at the festival for a total of ninety minutes.

b.    Michael Caplinger, one of the CBT employees who saw Appellant at Oktoberfest, chatted with Appellant for fifteen minutes and saw him walk "a few steps." In a signed statement (identical to that of Glen Adkins, below) he stated that Appellant was "seemingly unimpaired."

c.    Glen Adkins, a CBT employee who personally disliked Seeger, saw Seeger through the crowd walking "seemingly unimpaired," for fifty to seventy-five feet. Adkins was aware Seeger was on disability leave and reported seeing Seeger at Oktoberfest to Theresa Greenwald. Adkins said that Appellant "did not appear to be impaired or disabled."

d.    Michelle Simpson, Appellee's Director of Employee Relations and Recruiting, consulting with Greenwald, reviewed Appellant's medical file and determined that Seeger's reported medical condition and his behavior at Oktoberfest were not consistent, and therefore to decided to suspend and, later, fire Appellant.

e.     Simpson's conclusion was that, because Appellant had reported himself in excruciating pain, "reported difficult changing positions," and his doctor had told Appellee "no work," but was seen "by two independent witnesses walking around Oktoberfest where it's a crowded venue and not easily accessed . . . I thought that . . . was fraudulent on his part."

I would conclude that the overwhelming weight of evidence supports Appellant's contention that Appellee's investigation was so poor and one-sided as to be "unworthy of credence" and thus not sufficient to satisfy an "honest belief." At a minimum, Appellant has presented sufficient evidence to permit a reasonable jury to find the same. Summary judgment for Appellee is inappropriate. Therefore, I respectfully dissent.