*593 CLAY, Circuit Judge,
dissenting.
The district court wrongly decided this case, and the majority adopts much of the lower court’s flawed reasoning. First, the manner by which the district court handled discovery was legally inappropriate, affected Plaintiffs ability to support her claims, and constituted an abuse of discretion. Second, the district court improperly determined that Plaintiff failed to establish a prima facie case of age discrimination. Finally, the conclusion shared by the district court and the majority that Defendants honestly believed the truth of the reasons proffered for Plaintiffs termination cannot be sustained. Because I believe Plaintiff has put forth sufficient evidence to establish genuine disputes of material fact in this case, notwithstanding the erroneous discovery ruling, I respectfully dissent.
I. Admission of the PEERS Report Summary
Following Plaintiffs termination, Defendant Ryan Hernandez created a summary of the full PEERS report in response to inquiries from the Equal Employment Opportunity Commission (“EEOC”) and the Michigan Department of Civil Rights (“MDCR”). Subsequently, Defendant used this summary to defend itself against Plaintiffs claims. As a result, Plaintiff moved to compel discovery of the full PEERS report, which was denied by the district court.
“The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad.” Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 402 (6th Cir. 1998). Pursuant to Rule 26(b)(1), “[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party’s claim or defense.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.” Fed.R.Civ.P. 26(b)(1). The district court concluded that the report was not subject to these broad rules of discovery because the report is protected by the Michigan peer review privilege. The court also rejected Plaintiffs second argument that Defendant waived the peer review privilege by including information from the report in the case record and by providing excerpts of the report to the EEOC and MDCR. The district court resolved this claim by stating that the Michigan courts have yet to rule on that issue and because “unlike other statutorily-created privileges which contain an explicit waiver provision, the peer review statutes contain no waiver provision.” (R. 24, Dist. Ct. Order, PagelD# 245 (citing Mich. Comp. Laws §§ 333.21517 and 339.1611).)
Even assuming, without deciding, that the district court properly invoked Michigan’s peer review privilege, the district court nevertheless abused its discretion by excluding the full PEERS report while admitting a summary of the report prepared by one of the defendants in this ease. Although the Michigan courts have not yet ruled on waiver or forfeiture of this particular privilege, it is clear that a district court cannot allow one-sided discovery, and as the majority notes, a “privilege cannot at once be used as a shield and a sword.” Ross v. City of Memphis, 423 F.3d 596, 604 (6th Cir.2005) (internal quotation marks omitted). Generally, “litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case.” In re Lott, 424 F.3d 446, 454 (6th Cir.2005). See also United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.1991) (“A defendant may not use the privilege to prejudice his opponent’s case or to disclose some selected communications for self-serving purposes.”).
*594 However, that is exactly what occurred in this case. Defendants waived the privilege “by making tactical use of it in litigation.” Reitz v. City of Mt. Juliet, 680 F.Supp.2d 888, 894 (M.D.Tenn.2010). Defendants used their self-produced summary of the PEERS report as evidence against Plaintiff while also asserting that the full document, upon which the summary was supposedly based, was privileged. It is impossible for this Court to determine whether that summary provides an accurate rendering of the undisclosed full report. In fact, although the majority contends that Plaintiff “has not shown that she suffered any prejudice as a result of the inclusion of the short excerpt,” Maj. Op. at 588, there is no way we can determine the truth of the contention that Plaintiff was not prejudiced by a summary that may well be incomplete and misleading. In any event, it makes no sense to impose on Plaintiff the burden of demonstrating how she might have been prejudiced by the summary of a potentially critical piece of evidence which has been withheld from her. Indeed, Plaintiff need not point to particular information in the summary that goes beyond that contained in the witness statements. Instead, it is fair to assume that she was clearly prejudiced by the admission of a one-sided document drafted by Defendants to defend themselves in preparation for administrative proceedings and a possible lawsuit. It is impossible to know whether the full PEERS report included statements favorable to Plaintiff or whether Hernandez embellished the summary to provide support for the hospital’s defense. By allowing admission of this summary, the court improperly assumed the truth and essential completeness of its statements. The district court’s decision affected Plaintiffs ability to support her claims in this matter and gave Defendant an unfair and unwarranted advantage.
II. Truth of Defendant’s Proffered Reasons
The district court’s errors did not end with this discovery decision. Instead, the district court continued down a path of inaccurate and conclusory analysis. First, as the majority properly concludes, the district court erred in finding that Plaintiff failed to establish a genuine dispute of fact on her prima fade case of age discrimination. Second, the district court erred in finding that even if Plaintiff could establish a prima fade case, the reasons proffered by Defendant for Plaintiffs termination were not pretextual.
There is more than sufficient evidence in the record to call into question the truth of the hospital’s proffered reasons for Plaintiffs termination. Plaintiffs discharge notice stated as follows:
By performing in a manner that causes grave harm/potential grave harm to the patient or SJMO. Ms. Loyd acted outside of her scope of duties and advised a patient incorrectly about the patient’s ability to leave the premises. This behavior exacerbated the patients [sic] behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required SJMO staff to place patient in restraints. This is a major infraction violation of the employee discipline policy. Ms. Loyd is currently on a final written warning therefore this infraction results in discharge from employment effective today, 7/1/2011.
(R. 1-8. Discharge Notice, PageID#46.) While it is clear that Plaintiff questioned a nurse’s justification in restraining the patient and informed the patient that she might be able to leave the hospital, there is a genuine dispute of material fact regarding whether Plaintiffs conduct “exacerbated the patient’s behavior in a negative manner that resulted in the patient at-
*595 tempting to pull [her IV] out [and] required SJMO staff to place patient in restraints.” (Id.) It is also unclear whether Plaintiffs actions, when taken together, constitute a major infraction sufficient to justify terminating an employee. Basically, some of the evidence in the record corroborates the allegations in the discharge notice, while other statements in the record provide evidence to the contrary.
As previously indicated, the PEERS report, which was filed by nurse Sonya Moak soon after the incident occurred, is not available due to the district court’s denial of Plaintiffs motion to compel discovery. Therefore, all that is available is Defendants’ summary of the report, which was drafted by Hernandez in response to the EEOC and MDCR inquiries. Even this one-sided summary of the PEERS report may not contain sufficient information to substantiate the charges against Plaintiff. The Hernandez summary states,
Nurse requested Security to retain a “Pit & Certed” patient. Patient becoming agitated and verbally threatening (threatening to leave and threatening to stab staff). Anita tried to de-escalate patient. Patient wanted to see petition and stated she came here to stop using drugs. Anita told patient that she could leave if she wasn’t suicidal and stated to Nurse that patients that are here for drugs and alcohol are not Psych patients.
(R. 35-4, PEERS Report Summary, Pa-gelD# 721.) This summary lacks specific information regarding whether Plaintiffs conduct exacerbated the patient’s behavior, which was a critical component of Plaintiffs discharge notice, and without which, it is unclear that Plaintiffs actions warranted termination. The summary, even if accurate, which is dubious, fails to adequately describe the events leading up to the incident in question or the surrounding context for Plaintiffs alleged behavior.
During a deposition, Moak wavered when responding to questions regarding Plaintiffs actions during the patient restraint incident. At one point, Moak indicated that Plaintiff “didn’t try to interfere” with the patient and that Plaintiff “didn’t refuse” to participate in restraining the patient. (R. 22-2, Moak Dep., Pa-geID#209.) Moments later, Moak testified that Plaintiff refused to help in restraining the patient. Moak also stated during that same deposition that she drafted the PEERS report because she did not believe Plaintiffs behavior that night was appropriate. However, she did not provide a detailed explanation of that allegedly inappropriate behavior.
Statements from two of Plaintiffs fellow public security officers are also included in the record. On June 20, 2011, Officer Pete Kowalak stated that “[w]hen [he] arrived on this call ... Loyd was discussing the patient’s situation.... [He] also heard Ofc. Loyd state to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things.” (R. 27-24, Kowalak Statement, Page ID# 470.) Kowalak provided another statement on June 23, 2011, indicating that after he heard Plaintiffs discussion with the E.R. staff, he stepped out of the room because “E.R. staff was not ready to restrain the patient yet and the patient was not acting aggressive.” (R. 27-22, Loyd MAP, Pa-geID#465.) Officer David Sikorski and Nurse Mark Bott also provided statements, Sikorski on June 17, 2011, and Bott on an unknown date, which were intended to substantiate the employer’s version of events. However, also available in the record is nurse Anna Novak’s deposition transcript. During her deposition, Novak indicated that she did not observe Plaintiff acting in an inappropriate manner during *596 the parts of the incident involving the patient that she observed. She asserted that had she witnessed such misconduct, she would have included that information in the progress report she drafted later that evening. Furthermore, Novak clearly asserted during her deposition that the patient was already agitated and had already attempted to take out her IV before any security officers arrived on the scene, contradicting Kowalak’s statement that the patient was not yet acting aggressively when he arrived in the room.
The record also contains Plaintiffs deposition transcript. Although Plaintiff admits that she inquired about the patient’s status before agreeing to apply restraints, she believes she acted in a manner consistent with hospital policy, and she contests the truth of the other allegations against her. In fact, she contests that she ever indicated that the patient could leave the hospital and states that she only inquired about the patient’s status to help de-esca-late the situation. She states that she did, in fact, assist in restraining the patient once it became clear that a restraint was needed.
Many of these statements obviously provide different versions of the incident in question. Only two of the witnesses’ statements substantiate the reasons for Plaintiffs termination as set forth in the discharge notice, while some leave out critical facts and others provide evidence to the contrary. Even the PEERS report summary drafted by one of the defendants in this case fails to fully corroborate the reasons set forth in Plaintiffs discharge notice. When considered together, these statements establish a genuine dispute of material fact regarding whether the hospital’s proffered nondiscriminatory reasons had any basis in fact.
III. Defendant’s Honest Belief
Defendants argue that even if Plaintiff can establish a genuine dispute of material fact regarding pretext, they may still be entitled to summary judgment based on the “honest belief’ doctrine. As this Court has stated, “If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous.” Upshaw v. Ford Motor Co., 576 F.3d 576, 586 (6th Cir.2009). “The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action.” Sy-brandt v. Home Depot, U.S.A., Inc., 560 F.3d 553, 559 (6th Cir.2009) (internal quotation marks omitted). This Court “will not ‘blindly assume that an employer’s description of its reasons is honest.’ ” Wright v. Murray Guard, Inc., 455 F.3d 702, 708 (6th Cir.2006) (quoting Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir.1998)). Instead, the employee is given the opportunity to “produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process unworthy of credenee[J” Smith, 155 F.3d at 807-08 (internal quotation marks omitted).
In the instant case, the district court and now the majority improperly conclude that even if Plaintiff could set forth a prima facie case of discrimination, she failed to establish a genuine dispute of fact regarding whether Defendants honestly believed Plaintiffs actions warranted termination.
*597 First, it is impossible for us to know what knowledge Defendant had at the time the termination decision was made because the full PEERS report is not available to us. It is quite possible that the full PEERS report contained statements favorable to Plaintiff. However, because that report is unavailable, and we only-have access to the self-serving summary prepared by Defendants in response to the EEOC and MCDR inquiries, we cannot know what information was available to Defendant at the time the decision to terminate Plaintiffs employment was made.
Even if we ignore this error by the district court in failing to order disclosure of the PEERS report, there is sufficient evidence available in the record to establish a genuine dispute of fact regarding Defendants’ purported “honest belief’ at the time the termination decision was made. As the majority acknowledges, it is not actually clear from the record that each of the four statements considered by the district court was available to Defendants before Plaintiff was terminated. Bott’s statement does not include a date, and Moak’s statement was clearly given to Defendants on August 1, 2011, a month after Plaintiff was terminated. Therefore, this Court may not consider that evidence when determining whether the honest belief rule applies in this case.
The evidence that was clearly available to the hospital at the time of the adverse employment action included the following: (1) the PEERS report, which is summarized above; (2) the statement from Plaintiff admitting to some of the underlying conduct but denying that she committed the more egregious conduct; (3) two statements from Officer Kowalak dated June 20 and 23, 2011, which only stated that Plaintiff was “discussing the patient’s situation,” that Plaintiff “state[d] to the E.R. staff that coming to the ER for drugs or psych problems were two different things,” and that “[i]t appeared that Mott was getting upset with Anita because she was questioning the petition and weather [sic] or not the patient had the right to leave A.M.A.,” R. 27-22, Loyd MAP, Pa-gelD# 465; and (4) a statement from Officer Sikorski dated June 17, 2011, which substantiates some of the conduct discussed in the discharge notice.
Had the statements and the remainder of the evidence available to the hospital told the same story as the discharge papers, that Plaintiffs actions exacerbated the psychiatric patient’s condition and threatened everyone’s safety, as was suggested in her discharge papers, Defendant might have honestly believed Plaintiffs conduct warranted termination. However, in the instant case, Defendant only conducted a brief investigation and obtained Plaintiffs statement and two witnesses’ statements, neither of which told the same story and only one of which corroborated the allegations set forth in the discharge papers. Furthermore, the PEERS report summary, which was also available at the time the termination decision was made, did not corroborate those allegations. This Court should expect that any reasonable employer, faced with this minimal amount of evidence, would conduct further inquiries before proceeding with an adverse employment action. Other witnesses were present during the incident who could have been interviewed, and other records could have been consulted prior to Plaintiffs termination. Instead, Defendants jumped to terminate Plaintiff, claiming that her conduct caused the potential for grave harm to the patient and hospital staff. Although this Court does not require that an employer’s investigation be perfect, see Smith, 155 F.3d at 807, the circumstances of this case leave one with serious doubts as to whether Defendant could have honestly believed that Plaintiff *598 “performe[d] in a manner that cause[d] grave harm/potential grave harm to the patient or SJMO.” (R. 1-8, Discharge Notice, PagelD# 46.)
The majority asserts that even if an “open question exists as to whether [Plaintiffs] actions actually exacerbated the psychiatric patient’s condition,” Maj. Op. at 591, her conduct clearly constituted insubordination sufficient to warrant termination. By so doing, the majority seems to assume that Plaintiffs actions alone violated the hospital’s policy and therefore constituted insubordination. There are two problems with this argument.
First, it does not appear that Defendants ever offered “insubordination” alone as the cause of Petitioner’s termination. Instead, Defendants proffered reason for Plaintiffs termination was that she “perform[edj in a manner that cause[d] grave harm/potential grave harm to the patient or SJMO. Ms. Loyd acted outside of her scope of duties ... [and that] behavior exacerbated the patients [sic] behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required SJMO to place patient in restraints. This is a major infraction violation of the employee discipline policy.” (R. 1-8, Discharge Notice, PagelD# 46.) In fact, “insubordination” and “performance that causes grave harm/potential grave harm to the patient or SJMO-MO” are listed as separate major infractions in the hospital’s discipline policy. (R. 27-6, Employee Discipline Policy, Pa-gelD# 390-391.) Because Plaintiff was not terminated for insubordination alone, the majority’s assertion that Plaintiffs conduct was sufficient for termination even absent the escalation in the patient’s behavior does not hold water.
Second, it is not even clear that Plaintiffs conduct constituted insubordination in this case or that the employer reasonably believed that it did. The majority points to a hospital policy stating that security guards “shall expect that medical personnel have made an assessment of the situation and adhere[d] to restraint protocols prior to calling the officer.” (R. 27-18, Department Authority, PagelD# 435.) It is not at all clear that Plaintiff violated the policy or that violation of the policy constituted “insubordination” warranting termination. Although Plaintiff was on final-written-warning status at the time this incident occurred, whether her conduct was accurately described in the witness statements or constituted insubordination warranting her termination is a question appropriately decided by a jury.
Although this Court “do[es] not require that the decisional process used by the employer be optimal or that it left no stone unturned,” Smith, 155 F.3d at 807, there appears in this case to be a genuine dispute of fact as to whether the hospital honestly believed Plaintiff committed the conduct set forth in her discharge papers and whether her conduct was sufficient to constitute insubordination. On summary judgment, the question is not “whether the court finds that [the employer] made a reasonably informed and considered decision before terminating [the employee]. The proper question is whether a reasonable jury could have concluded that [the employer’s] investigation was unworthy of credence.” Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 288 (6th Cir.2012) (Tar-now, J., dissenting) (internal quotation marks omitted). Based on the evidence as described above and the unavailability of the full PEERS report, which the district court inappropriately refused to order disclosed, there exists a genuine dispute of material fact regarding whether Defendants’ investigation was unworthy of credence.
*599 I would therefore reverse the decisions of the district court admitting the PEERS report summary without also ordering disclosure of the full PEERS report, and granting Defendants’ motion for summary judgment, and would remand the case to allow for a jury to properly weigh the evidence.