RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ANITA LOYD,

> *Plaintiff-Appellant,*

*v.*

No. 13-2335

SAINT JOSEPH MERCY OAKLAND et al.,

> *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-12567—Gershwin A. Drain, District Judge.

Argued: July 29, 2014

Decided and Filed: September 10, 2014

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Joseph T. Ozormoor, Grosse Pointe Farms, Michigan, for Appellant. Daniel J. Bretz, CLARK HILL PLC, Detroit, Michigan, for Appellees. **ON BRIEF:** Joseph T. Ozormoor, Grosse Pointe Farms, Michigan, for Appellant. Daniel J. Bretz, Anne-Marie Vercruysse Welch, CLARK HILL PLC, Detroit, Michigan, for Appellees.

GILMAN, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 15–23), delivered a separate dissenting opinion.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Anita Loyd, an African-American woman, worked as a security guard for 25 years at Saint Joseph Mercy Oakland/Trinity Health Hospital

in Pontiac, Michigan before being terminated in July 2011 following an incident with an agitated and combative patient. Loyd was 52 years old at the time of her termination. She alleges that the hospital fired her because of her age, race, and sex, whereas the hospital contends that she was discharged for a major violation of hospital policy. The district court granted the hospital's motion for summary judgment on all of Loyd's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Although Loyd had been employed as a security guard at the hospital since 1986, her disciplinary record was not unblemished. In 2001, for example, Loyd received a written warning for failing to help restrain a patient under circumstances very similar to the 2011 incident that led to her discharge; i.e., she questioned the authority of the medical staff to have the patient restrained. The record also shows that Loyd received a written warning in 2004 for refusing to work overtime hours.

Two more incidents involving Loyd occurred in 2010. In the first incident, Loyd left work due to illness without first obtaining permission from her supervisor, which constitutes a minor infraction under the hospital's discipline policy. The second incident involved Loyd abandoning her post without excuse or permission, which is a major infraction under the hospital's policy. In that incident, Loyd was found sitting on the porch of a house near the hospital while on duty. Loyd admitted to the underlying conduct, but claimed that her intent was to connect with the surrounding community. The hospital placed Loyd on final-written-warning status following this second 2010 incident.

Loyd and the hospital disagree on the details of the June 2011 incident that led to her termination. According to the hospital, Loyd was dispatched on June 16, 2011 to a room containing a female psychiatric patient. The patient was agitated and combative, and the medical staff needed help in restraining her. But instead of helping to restrain the patient, Loyd asked the patient why she was in the hospital. Loyd told the patient that she could leave the hospital if she had been admitted for a drug-related or alcohol-related (as opposed to a psychiatric) reason.

Mark Bott, one of the nurses on duty, then began to argue with Loyd. Loyd maintained that drug-related and alcohol-related admissions were different from psychiatric-based admissions. She also demanded to see the patient's admissions paperwork in order to determine whether the patient had been "petitioned and certified" (a hospital term for "involuntarily admitted"). Loyd's actions exacerbated the patient's condition to the point where the patient tried to pull an IV out of her own arm. Two other security guards, Pete Kowalak and David Sikorski, eventually succeeded in restraining the patient. Loyd made no attempt to help Kowalak or Sikorski.

Although Loyd concedes that the June 16, 2011 incident occurred, she disputes the hospital's version regarding a number of the details. Loyd admits that she talked to the patient and told the patient that she (Loyd) would find out from the medical staff whether the patient could leave. She further admits that she walked out of the patient's room and asked a nurse, Sonya Moak, whether the patient had been petitioned and certified. Loyd denies, however, that she failed to help restrain the patient. She also denies that the patient became more combative as a result of Loyd's actions.

Following the incident, the hospital began an internal investigation. Moak drafted and filed an incident report with the hospital's Potential Error Event Reporting System (PEERS), which is a part of the hospital's quality-assurance review system. Ryan Hernandez, the hospital's human-resources representative, then took statements from witnesses. Two of the witness statements were provided by Kowalak and Sikorski. Kowalak's statement, dated June 20, 2011, explained that

> [w]hen I arrived on this call I observed that . . . Loyd was discussing the patient's situation. She stated that there was no petition ordered. I also heard . . . Loyd state to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things[,] at this time writer [Kowalak] had stepped out of the room.

Sikorski's statement, dated June 17, 2011, recounted further details:

> Upon my arrival to E.R. 19, Anita Loyd was already in the room, talking with the patient. Also in the room were R.N. Mark Bott and one other person whom I don't know. At one point I overheard Loyd tell the patient that she did not have to stay if she did not want to. Loyd went on to ask the patient, "What you in here

for?" The patient replied that she "had a problem with drugs." Loyd then went and made a statement, "Drugs and alcohol is different than psych." "You can't keep her here, she can sign herself out." Bott was obviously agitated by these remarks and told Loyd, "You can't tell her that." "She has to stay." "You have no business talking to her." "She has a petition against her." The patient then demanded to see the petition. R.N. Moak was now standing at the room door and said to the patient, "Let me get it." Moak left the area and came back with the patients [sic] chart. Moak did not see the petition on the chart. Moak then got on the phone and asked someone if the patient was petitioned. Moak hung up the phone and stated that the social worker had signed a petition and that the patient was "unable" to leave. The patient then became upset and stated that she was leaving. The patient then grabbed her I.V. and tried to pull it out of her hand. Bott then grabbed the patient and prevented her from pulling out the I.V. Bott pushed the patient down onto the bed and started to put on the restraints. At this time, Kowalak and I assisted Bott in restraining the patient. Loyd did not assist in the restraint. After the patient was restrained, Kowalak and I left the room. Loyd stayed in the room with the patient.

Hernandez also obtained statements from Bott and Moak about the incident. Both statements confirmed that Loyd had questioned whether it was proper to restrain the patient. Bott, however, did not sign his statement until August 2011. The hospital claims that "because Bott works midnights and Hernandez worked days, Hernandez was unable to obtain Bott's signature . . . until weeks later."

Moak's statement is also dated in August 2011. The hospital states that Hernandez interviewed Moak twice (once immediately after the incident and once in preparation for an August 2011 grievance hearing), but that Hernandez recorded only the date of the later interview.

Hernandez eventually prepared a summary of the internal investigation that contained witness statements from Bott, Kowalak, Loyd, Moak, and Sikorski. The summary also contained a five-line excerpt from the PEERS report that Moak had drafted. That excerpt stated the following:

> Nurse requested Security to restrain a "Pit & Certed" patient. Patient becoming agitated and verbally threatening (threatening to leave and threatening to stab staff). Anita tried to deescalate patient. Patient wanted to see petition and stated she came here to stop using drugs. Anita told patient that she could leave if she wasn't suicidal and stated to Nurse that patients that are here for drugs and alcohol are not Psych patients.

Steve Kazimer and Greg Williams, who were Loyd's supervisors, decided to terminate Loyd's employment on July 1, 2011 after reviewing the results of the internal investigation. The discharge notice explained that Loyd had

> acted outside the scope of [her] duties and advised a patient incorrectly about the patient's ability to leave the premises. This behavior exacerbated the patient's behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required [hospital] staff to place the patient in restraints. This is a major infraction [and a] violation of the employee discipline policy. Plaintiff is currently on a Final Written Warning therefore this infraction results in discharge from employment effective today 7/1/11.

Loyd subsequently filed a union grievance challenging her termination. The hospital denied the grievance at Step 3 of the grievance-adjustment process mandated by the Collective Bargaining Agreement (CBA) between the hospital and Loyd's union, and upheld Loyd's termination. Following this action by the hospital, the union notified the hospital in writing that it was declining to arbitrate the grievance because "the Union decided[,] based upon the facts and evaluation of the likelihood of success on the merits of the case, that it was unlikely that . . . arbitration would result in the reinstatement of Ms. Loyd."

The hospital posted an advertisement for Loyd's position on July 21, 2011. Although the position was originally offered to a Caucasian man, the man declined the hospital's offer. The hospital then hired a 39-year-old African-American woman to fill Loyd's position in November 2011.

Loyd, for her part, filed a charge of discrimination with the Equal Employment Opportunity Commission and the Michigan Department of Civil Rights in September 2011. In her charge, Loyd alleged that the hospital had terminated her employment because of her age, race, and sex. The EEOC dismissed the charge and issued Loyd a right-to-sue letter in March 2012. Loyd then filed suit against the hospital and five hospital employees (Bott, Hernandez, Kazimer, Sikorski, and Williams) in June 2012.

During the course of discovery, Loyd filed a motion to compel the production of certain evidence. One piece of evidence sought in the motion was the PEERS report. Another was a surveillance video that allegedly contained a recording of the area outside the psychiatric patient's room on June 16, 2011. Loyd argued to the district court that both pieces of evidence

were "crucial to show that the reasons stated for her termination . . . had no basis in fact and were fabricated."

In its response to Loyd's motion to compel, the hospital contended that the PEERS report was privileged (and therefore not discoverable) under Michigan law. Moreover, the hospital explained that the surveillance video had been overwritten 30 days after the incident occurred pursuant to the hospital's routine practice of doing so after 30 days.

Loyd responded that the hospital had waived any privilege by including the five-line excerpt of the PEERS report in materials that the hospital had filed with the EEOC (the five-line excerpt appeared in Hernandez's summary of the internal investigation). She also urged the district court to impose sanctions against the hospital for its failure to preserve the surveillance video. Loyd sought in particular a sanction that would exclude any testimony from the hospital's witnesses about the incident.

Following a hearing on Loyd's motion to compel, the district court denied the motion in March 2013. The court concluded that (1) the PEERS report was privileged under Michigan law, and (2) the hospital had not waived the privilege by filing the five-line excerpt of the PEERS report with the EEOC. It also declined to issue sanctions against the hospital, explaining that Loyd "may [instead] be entitled to a jury instruction that the jury may draw an inference adverse to the culpable party from the absence of evidence."

The hospital then filed a motion for summary judgment on all of Loyd's claims. After a hearing, the district court granted the motion and entered judgment in favor of the hospital, holding that Loyd could not establish a prima facie case of age, race, or sex discrimination because Loyd could not demonstrate that she was qualified for the security-guard position. It based this determination on the conclusion that Loyd had failed to perform her job at a level that met the hospital's legitimate expectations.

Moreover, even if Loyd could establish a prima facie case of discrimination, the district court held that Loyd could not show that the hospital's proffered reason for firing her was a pretext intended to disguise unlawful discrimination. The district court also dismissed Loyd's Michigan common-law claims (intentional interference with a contractual relationship and

intentional infliction of emotional distress) on the ground that both claims were preempted by the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), which "'preempts state law rules that substantially implicate the meaning of the collective bargaining agreement terms.'" *Loyd v. St. Joseph Mercy Oakland/Trinity Health SJMO Pub. Safety Dep't*, No. 12-12567, 2013 WL 4805751, at *7 (E.D. Mich. Sept. 9, 2013) (quoting *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)).

This timely appeal by Loyd followed. In her appeal, Loyd contends that the district court committed reversible error in denying her motion to compel and in dismissing her claims at the summary-judgment stage of the case.

## II. ANALYSIS

### A.     Standard of review

We review a district court's discovery-related rulings under the highly deferential abuse-of-discretion standard. *B & H Med., LLC v. ABP Admin., Inc.*, 526 F.3d 257, 268 (6th Cir. 2008). An abuse of discretion will not be found unless (1) the district court's decision is predicated on an erroneous conclusion of law, (2) the district court's factual findings are clearly in error, or (3) the district court's decision is, when taken as a whole, "clearly unreasonable, arbitrary or fanciful." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 343 (6th Cir. 2002) (internal quotation marks omitted).

In contrast, we review de novo a district court's grant of summary judgment. *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmovant, reveals that no genuine dispute of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In reviewing a grant of summary judgment, we accept all of the nonmovant's evidence as true and draw all reasonable inferences in the nonmovant's favor. *Id.* at 255.

**B.     The district court did not err in denying Loyd's motion to compel and her request for sanctions**

Loyd first attacks the district court's denial of her motion to compel and her request that the hospital be sanctioned for its alleged discovery violations.  We discern no error in the district court's discovery order.  Although Loyd argues that the PEERS report is not privileged under Michigan law because the privilege does not extend to reports involving the actions of hospital security guards, this argument has no merit.  Michigan courts have construed the hospital-peer-review privilege (which is codified at M.C.L. § 333.21515) to encompass reports involving staff members who are not physicians or nurses.  *See Ligouri v. Wyandotte Hosp. & Med. Ctr.*, 655 N.W.2d 592, 594–95 (Mich. Ct. App. 2002) (analyzing the statute and holding that peer-review reports discussing the alleged negligence of an unknown staff member were privileged in a case involving a patient who tripped and fell on a fan cord).

Nor did the district court commit reversible error in holding that the hospital had not waived the privilege.  Although a party may not use an applicable privilege as both a sword and a shield, *cf. Ross v. City of Memphis*, 423 F.3d 596, 604 (6th Cir. 2005) (involving the attorney-client privilege), Loyd has not shown that she suffered any prejudice as a result of the inclusion of the short excerpt.  The PEERS summary included in Hernandez's report revealed nothing more than the information contained in the witness statements.  Accordingly, her argument regarding the hospital's alleged waiver of its privilege fails because the excerpt's inclusion did not harm Loyd's case in any material way.

Finally, the district court did not err in declining to impose the sanctions urged by Loyd for the hospital's failure to preserve the surveillance video.  Loyd concedes in her brief that the district court was not required to exclude testimony from the hospital's witnesses (which is what she asked the district court to do) even if the court believed that sanctions were warranted.  And the district court did not reject Loyd's sanctions argument outright.  It instead explained that Loyd might be entitled to an adverse-inference jury instruction at trial.  Our caselaw gives district courts wide latitude to fashion appropriate remedies for discovery violations, *Bentkowski v. Scene Magazine*, 637 F.3d 689, 697 (6th Cir. 2011), and the district court did not abuse that discretion here by effectively taking the adverse-inference-instruction issue under advisement.

**C.     The district court did not err in granting summary judgment on Loyd's race- and sex-discrimination claims**

We now turn to the district court's grant of summary judgment on Loyd's race- and sex-discrimination claims.  Because Loyd offered only circumstantial evidence of discrimination at the district-court level, the familiar *McDonnell Douglas* burden—shifting framework governs Loyd's federal and state-law claims of race and sex discrimination.  *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706–07 (6th Cir. 2006) (applying the burden-shifting framework to Title VII race- and sex-discrimination claims); *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000) (holding that the framework applies to claims under Michigan's Elliott-Larsen Civil Rights Act (ELCRA)).

Loyd has the burden of establishing a prima facie case of discrimination under the burden-shifting framework.  *Wright*, 455 F.3d at 707.  To do so, she must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, non-protected employees.  *Id.*

The hospital does not dispute that Loyd established the first two elements of a prima facie case of race and sex discrimination.  We will defer any discussion of the third element (see below) because the fourth element is dispositive.  With regard to this fourth element, the district court noted in its summary-judgment order that Loyd had failed to put forward any evidence that she was treated differently or less favorably than similarly situated hospital employees outside of the protected classes.  Furthermore, the record shows that Loyd was replaced by an African-American woman.  Loyd thus failed to establish a prima facie case of either race or sex discrimination.

**D.     The district court did not err in granting summary judgment on Loyd's age-discrimination claims**

Turning now to Loyd's claims of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and ELCRA, Mich. Comp. Laws Ann. § 37.2101, the district court granted summary judgment on those claims for two reasons.  The district court first held that Loyd could not establish that she was qualified for the security-guard position,

which was fatal to her prima facie case.  Second, the district court concluded in the alternative that Loyd could not show that the hospital's proffered reason for terminating her employment was pretextual.  The district court's first holding was erroneous, but its alternative holding was sound.

Under the *McDonnell Douglas* burden-shifting framework that governs age-discrimination claims, *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009), the requirement that a plaintiff establish a prima facie case of age discrimination is not intended to be an onerous one.  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (characterizing the prima facie requirement as "not onerous").  Once a plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendant employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action.  *Geiger*, 579 F.3d at 626.  The plaintiff then bears the burden of demonstrating that the proffered reason was in fact a pretext designed to conceal unlawful discrimination.  Pretext can be shown by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc).

The district court's error in analyzing Loyd's prima facie case of age discrimination stemmed from the court's conflation of the qualification prong with the hospital's proffered reason for terminating Loyd's employment.  We have repeatedly cautioned district courts against "consider[ing] the employer's alleged nondiscriminatory reason when analyzing the prima facie case." *Id.* at 574.  Moreover, a plaintiff can satisfy the qualification prong by showing that she performed at a level that generally met her employer's objective minimum qualifications. *Id.* at 575–76.

The district court in this case relied too heavily on the incident that caused Loyd's termination in evaluating the qualification prong.  Loyd had worked as a security guard at the hospital for 25 years before she was terminated in June 2011.  This is compelling evidence that Loyd met the hospital's objective minimum qualifications at the time of her termination, notwithstanding her previous negative performance reviews. *See id.* at 576 (explaining that the

inquiry as to whether a plaintiff was qualified for a position "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills"). The district court erred by focusing on the hospital's proffered reason for terminating Loyd rather than on Loyd's objective qualifications for the security—guard position in evaluating her prima facie case.

Nevertheless, the district court did not err in granting summary judgment on Loyd's age-discrimination claims. The court held in the alternative that Loyd could not demonstrate that the hospital's stated reason for firing her was pretextual. In particular, the court relied on the "honest-belief rule" in so holding. As found by the court, "the evidence shows that Defendant terminated Plaintiff based on its honestly held belief, based on particularized facts, that she committed a major infraction while on final warning." *Loyd v. St. Joseph Mercy Oakland/Trinity Health SJMO Pub. Safety Dep't*, No. 12-12567, 2013 WL 4805751, at *6 (E.D. Mich. Sept. 9, 2013).

The honest-belief rule provides that an employer is entitled to "summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (internal quotation marks omitted). An employer's pre-termination investigation need not be perfect in order to pass muster under the rule. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (holding that an employer need not demonstrate that its investigation was "optimal or that it left no stone unturned"). The key inquiry is instead "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (internal quotation marks omitted). And to rebut an employer's invocation of the rule, the plaintiff must offer some evidence of "an error on the part of the employer that is too obvious to be unintentional." *Id.* at 286 (internal quotation marks omitted).

Loyd argues that the hospital's proffered reason for firing her has no basis in fact. She notes, among other things, that two of the four witness statements taken in this case were not available to the hospital when it made its decision to terminate Loyd's employment on July 1, 2011. But even if we assume that Loyd's assertion is true, the two witness statements (Kowalak

and Sikorski) that indisputably were available to the hospital in June 2011 show that Loyd acted in an insubordinate manner.

Kowalak's statement, for example, reported that "Loyd state[d] to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things." This statement by Loyd violated the hospital's June 2010 directive that security guards "shall expect that medical personnel have made an assessment of the situation and adhere[d] to restrain[t] protocols prior to calling the officer." Loyd has no formal medical training and it was not her job to question the reasons why a patient has been admitted to the hospital.

Similarly, Sikorski recounted that Loyd stated in the patient's presence that "You can't keep her here, she can sign herself out." This is plainly insubordinate behavior by Loyd. Insubordination, moreover, is a major infraction under the hospital's discipline policy irrespective of whether the insubordination poses an actual or potential threat of harm to the staff or the patient.

Loyd argues that we should view the discharge notice with skepticism. She specifically contends that an open question exists as to whether her actions actually exacerbated the psychiatric patient's condition. But the answer to this question is ultimately irrelevant to the honest-belief analysis. *See Chen*, 580 F.3d at 401 (holding that an employer is entitled to summary judgment under the honest-belief rule "even if its conclusion is later shown to be mistaken"). The contemporaneous witness statements from Kowalak and Sikorski corroborate the substance of the discharge notice. And the hospital was well within its rights to fire Loyd given that (1) she was on final-written-warning status in June 2011, and (2) she had committed a major infraction insofar as she failed to abide by the hospital's directive that security guards "shall expect that medical personnel have made an assessment of the situation and adhere[d] to restrain[t] protocols prior to calling the officer."

In sum, the hospital took witness statements and made a reasonable assessment of the available evidence before terminating Loyd. The law does not require the hospital to do anything more. *See Seeger*, 681 F.3d at 285 (stating the rule than an employer need not prove "that it left no stone unturned"). To require otherwise would unduly frustrate an employer's ability to terminate insubordinate employees for legitimate, nondiscriminatory reasons.

Nor has Loyd offered any evidence of "an error on the part of the [hospital] that is too obvious to be unintentional." *See id.* at 286 (internal quotation marks omitted). The evidence in fact demonstrates just the opposite because Loyd had already received a written warning following a similar incident in May 2001 and was on final-written-warning status for a major infraction in 2010. Loyd has simply offered no evidence to rebut the hospital's honestly held belief that Loyd committed a major infraction on June 16, 2011, and this lack of evidence dooms Loyd's age-discrimination claims.

**E.    The district court did not err in granting summary judgment on the Michigan common-law claims**

Finally, Loyd argues that her Michigan common-law claims of intentional interference with a contractual relationship and intentional infliction of emotional distress should have been submitted to a jury. The district court granted summary judgment on both claims, holding that they were preempted by the LMRA.

Section 301 of the LMRA preempts "state law-based actions [that are] inextricably intertwined with consideration of the terms" of a CBA. *Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004) (internal quotation marks omitted). Preemption under § 301 of the LMRA applies not only to contract-based claims, but also to state-law tort claims. *Id.* To decide whether a state-law claim is preempted by the LMRA, we perform a two-step inquiry. The first step requires us to determine "whether resolving the state-law claim would require interpretation of the terms" of the CBA. *Id.* at 906. If interpretation of the CBA would be required, then the state-law claim is preempted and the inquiry is at an end. *Id.* The second step involves ascertaining "whether the rights claimed by the plaintiff were created by the [CBA], or instead by state law." *Id.* If the rights were created by the CBA, then the state-law claim is preempted. *Id.*

Here, Loyd's claim of intentional interference with a contractual relationship is based on the hospital's alleged failure to "honor and perform its contractual obligations" under the CBA. This claim is accordingly preempted by § 301 of the LMRA because it asserts "a right created not by state law," but instead created by the CBA between the hospital and Loyd's union. *See Mattis*, 355 F.3d at 907 (holding that a Michigan common-law claim of tortious interference with

a business relationship was preempted by § 301). The district court, therefore, did not err in its preemption analysis of the intentional-interference claim.

As for Loyd's claim of intentional infliction of emotional distress, we need not wade into the preemption question because run-of-the-mill claims of employment discrimination (as are alleged here) do not constitute extreme and outrageous conduct sufficient to state a claim of intentional infliction of emotional distress under Michigan law. *See Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir. 1996) (holding that a wrongful discharge, without more, does not provide a sufficient basis for such a tort claim under Michigan law). Because we may affirm a grant of summary judgment on any ground supported by the record, *Freeze v. City of Decherd*, 753 F.3d 661, 664 (6th Cir. 2014), summary judgment on Loyd's claim of intentional infliction of emotional distress was proper.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.  The district court wrongly decided this case, and the majority adopts much of the lower court's flawed reasoning.  First, the manner by which the district court handled discovery was legally inappropriate, affected Plaintiff's ability to support her claims, and constituted an abuse of discretion.  Second, the district court improperly determined that Plaintiff failed to establish a *prima facie* case of age discrimination.  Finally, the conclusion shared by the district court and the majority that Defendants honestly believed the truth of the reasons proffered for Plaintiff's termination cannot be sustained.  Because I believe Plaintiff has put forth sufficient evidence to establish genuine disputes of material fact in this case, notwithstanding the erroneous discovery ruling, I respectfully dissent.

I.      **Admission of the PEERS Report Summary**

Following Plaintiff's termination, Defendant Ryan Hernandez created a summary of the full PEERS report in response to inquiries from the Equal Employment Opportunity Commission ("EEOC") and the Michigan Department of Civil Rights ("MDCR").  Subsequently, Defendant used this summary to defend itself against Plaintiff's claims.  As a result, Plaintiff moved to compel discovery of the full PEERS report, which was denied by the district court.

"The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad."  *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998).  Pursuant to Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."  Fed. R. Civ. P. 26(b)(1).  The district court concluded that the report was not subject to these broad rules of discovery because the report is protected by the Michigan peer review privilege.  The court also rejected Plaintiff's second argument that Defendant waived the peer review privilege by including information from the report in the case record and by providing excerpts of the report to the EEOC and MDCR.  The district court resolved this claim by stating that the Michigan courts have yet to rule on that issue

and because "unlike other statutorily-created privileges which contain an explicit waiver provision, the peer review statutes contain no waiver provision." (R. 24, Dist. Ct. Order, PageID# 245 (citing Mich. Comp. Laws §§ 333.21517 and 339.1611).)

Even assuming, without deciding, that the district court properly invoked Michigan's peer review privilege, the district court nevertheless abused its discretion by excluding the full PEERS report while admitting a summary of the report prepared by one of the defendants in this case. Although the Michigan courts have not yet ruled on waiver or forfeiture of this particular privilege, it is clear that a district court cannot allow one-sided discovery, and as the majority notes, a "privilege cannot at once be used as a shield and a sword." *Ross v. City of Memphis*, 423 F.3d 596, 604 (6th Cir. 2005) (internal quotation marks omitted). Generally, "litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case." *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005). *See also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").

However, that is exactly what occurred in this case. Defendants waived the privilege "by making tactical use of it in litigation." *Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 894 (M.D. Tenn. 2010). Defendants used their self-produced summary of the PEERS report as evidence against Plaintiff while also asserting that the full document, upon which the summary was supposedly based, was privileged. It is impossible for this Court to determine whether that summary provides an accurate rendering of the undisclosed full report. In fact, although the majority contends that Plaintiff "has not shown that she suffered any prejudice as a result of the inclusion of the short excerpt," Maj. Op. at 8, there is no way we can determine the truth of the contention that Plaintiff was not prejudiced by a summary that may well be incomplete and misleading. In any event, it makes no sense to impose on Plaintiff the burden of demonstrating how she might have been prejudiced by the summary of a potentially critical piece of evidence which has been withheld from her. Indeed, Plaintiff need not point to particular information in the summary that goes beyond that contained in the witness statements. Instead, it is fair to assume that she was clearly prejudiced by the admission of a one-sided document drafted by Defendants to defend themselves in preparation for administrative proceedings and a possible

lawsuit.  It is impossible to know whether the full PEERS report included statements favorable to Plaintiff or whether Hernandez embellished the summary to provide support for the hospital's defense.  By allowing admission of this summary, the court improperly assumed the truth and essential completeness of its statements.  The district court's decision affected Plaintiff's ability to support her claims in this matter and gave Defendant an unfair and unwarranted advantage.

## II.      Truth of Defendant's Proffered Reasons

The district court's errors did not end with this discovery decision.  Instead, the district court continued down a path of inaccurate and conclusory analysis.  First, as the majority properly concludes, the district court erred in finding that Plaintiff failed to establish a genuine dispute of fact on her *prima facie* case of age discrimination.  Second, the district court erred in finding that even if Plaintiff could establish a *prima facie* case, the reasons proffered by Defendant for Plaintiff's termination were not pretextual.

There is more than sufficient evidence in the record to call into question the truth of the hospital's proffered reasons for Plaintiff's termination.  Plaintiff's discharge notice stated as follows:

> By performing in a manner that causes grave harm/potential grave harm to the patient or SJMO.  Ms. Loyd acted outside of her scope of duties and advised a patient incorrectly about the patient's ability to leave the premises.  This behavior exacerbated the patients [sic] behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required SJMO staff to place patient in restraints.  This is a major infraction violation of the employee discipline policy.  Ms. Loyd is currently on a final written warning therefore this infraction results in discharge from employment effective today, 7/1/2011.

(R. 1-8. Discharge Notice, PageID# 46.)  While it is clear that Plaintiff questioned a nurse's justification in restraining the patient and informed the patient that she might be able to leave the hospital, there is a genuine dispute of material fact regarding whether Plaintiff's conduct "exacerbated the patient's behavior in a negative manner that resulted in the patient attempting to pull [her IV] out [and] required SJMO staff to place patient in restraints."  (*Id*.)  It is also unclear whether Plaintiff's actions, when taken together, constitute a major infraction sufficient to justify terminating an employee.  Basically, some of the evidence in the record corroborates the

allegations in the discharge notice, while other statements in the record provide evidence to the contrary.

As previously indicated, the PEERS report, which was filed by nurse Sonya Moak soon after the incident occurred, is not available due to the district court's denial of Plaintiff's motion to compel discovery. Therefore, all that is available is Defendants' summary of the report, which was drafted by Hernandez in response to the EEOC and MDCR inquiries. Even this one-sided summary of the PEERS report may not contain sufficient information to substantiate the charges against Plaintiff. The Hernandez summary states,

> Nurse requested Security to retain a "Pit & Certed" patient. Patient becoming agitated and verbally threatening (threatening to leave and threatening to stab staff). Anita tried to de-escalate patient. Patient wanted to see petition and stated she came here to stop using drugs. Anita told patient that she could leave if she wasn't suicidal and stated to Nurse that patients that are here for drugs and alcohol are not Psych patients.

(R. 35-4, PEERS Report Summary, PageID# 721.) This summary lacks specific information regarding whether Plaintiff's conduct exacerbated the patient's behavior, which was a critical component of Plaintiff's discharge notice, and without which, it is unclear that Plaintiff's actions warranted termination. The summary, even if accurate, which is dubious, fails to adequately describe the events leading up to the incident in question or the surrounding context for Plaintiff's alleged behavior.

During a deposition, Moak wavered when responding to questions regarding Plaintiff's actions during the patient restraint incident. At one point, Moak indicated that Plaintiff "didn't try to interfere" with the patient and that Plaintiff "didn't refuse" to participate in restraining the patient. (R. 22-2, Moak Dep., PageID# 209.) Moments later, Moak testified that Plaintiff refused to help in restraining the patient. Moak also stated during that same deposition that she drafted the PEERS report because she did not believe Plaintiff's behavior that night was appropriate. However, she did not provide a detailed explanation of that allegedly inappropriate behavior.

Statements from two of Plaintiff's fellow public security officers are also included in the record. On June 20, 2011, Officer Pete Kowalak stated that "[w]hen [he] arrived on this call . . .

Loyd was discussing the patient's situation . . . . [He] also heard Ofc. Loyd state to the E.R. staff that coming to the ER for drugs or phsych [sic] problems were two different things." (R. 27-24, Kowalak Statement, Page ID# 470.) Kowalak provided another statement on June 23, 2011, indicating that after he heard Plaintiff's discussion with the E.R. staff, he stepped out of the room because "E.R. staff was not ready to restrain the patient yet and the patient was not acting aggressive." (R. 27-22, Loyd MAP, PageID# 465.) Officer David Sikorski and Nurse Mark Bott also provided statements, Sikorski on June 17, 2011, and Bott on an unknown date, which were intended to substantiate the employer's version of events. However, also available in the record is nurse Anna Novak's deposition transcript. During her deposition, Novak indicated that she did not observe Plaintiff acting in an inappropriate manner during the parts of the incident involving the patient that she observed. She asserted that had she witnessed such misconduct, she would have included that information in the progress report she drafted later that evening. Furthermore, Novak clearly asserted during her deposition that the patient was already agitated and had already attempted to take out her IV before any security officers arrived on the scene, contradicting Kowalak's statement that the patient was not yet acting aggressively when he arrived in the room.

The record also contains Plaintiff's deposition transcript. Although Plaintiff admits that she inquired about the patient's status before agreeing to apply restraints, she believes she acted in a manner consistent with hospital policy, and she contests the truth of the other allegations against her. In fact, she contests that she ever indicated that the patient could leave the hospital and states that she only inquired about the patient's status to help de-escalate the situation. She states that she did, in fact, assist in restraining the patient once it became clear that a restraint was needed.

Many of these statements obviously provide different versions of the incident in question. Only two of the witnesses' statements substantiate the reasons for Plaintiff's termination as set forth in the discharge notice, while some leave out critical facts and others provide evidence to the contrary. Even the PEERS report summary drafted by one of the defendants in this case fails to fully corroborate the reasons set forth in Plaintiff's discharge notice. When considered

together, these statements establish a genuine dispute of material fact regarding whether the hospital's proffered nondiscriminatory reasons had any basis in fact.

## III.     Defendant's Honest Belief

Defendants argue that even if Plaintiff can establish a genuine dispute of material fact regarding pretext, they may still be entitled to summary judgment based on the "honest belief" doctrine.  As this Court has stated, "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).   "The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) (internal quotation marks omitted).  This Court "will not 'blindly assume that an employer's description of its reasons is honest.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).   Instead, the employee is given the opportunity to "produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process unworthy of credence[.]"  *Smith*, 155 F.3d at 807–08 (internal quotation marks omitted).

In the instant case, the district court and now the majority improperly conclude that even if Plaintiff could set forth a *prima facie* case of discrimination, she failed to establish a genuine dispute of fact regarding whether Defendants honestly believed Plaintiff's actions warranted termination.

First, it is impossible for us to know what knowledge Defendant had at the time the termination decision was made because the full PEERS report is not available to us.  It is quite possible that the full PEERS report contained statements favorable to Plaintiff.   However, because that report is unavailable, and we only have access to the self-serving summary prepared by Defendants in response to the EEOC and MCDR inquiries, we cannot know what information

was available to Defendant at the time the decision to terminate Plaintiff's employment was made.

Even if we ignore this error by the district court in failing to order disclosure of the PEERS report, there is sufficient evidence available in the record to establish a genuine dispute of fact regarding Defendants' purported "honest belief" at the time the termination decision was made. As the majority acknowledges, it is not actually clear from the record that each of the four statements considered by the district court was available to Defendants before Plaintiff was terminated. Bott's statement does not include a date, and Moak's statement was clearly given to Defendants on August 1, 2011, a month after Plaintiff was terminated. Therefore, this Court may not consider that evidence when determining whether the honest belief rule applies in this case.

The evidence that was clearly available to the hospital at the time of the adverse employment action included the following: (1) the PEERS report, which is summarized above; (2) the statement from Plaintiff admitting to some of the underlying conduct but denying that she committed the more egregious conduct; (3) two statements from Officer Kowalak dated June 20 and 23, 2011, which only stated that Plaintiff was "discussing the patient's situation," that Plaintiff "state[d] to the E.R. staff that coming to the ER for drugs or psych problems were two different things," and that "[i]t appeared that Mott was getting upset with Anita because she was questioning the petition and weather [sic] or not the patient had the right to leave A.M.A.," R. 27-22, Loyd MAP, PageID# 465; and (4) a statement from Officer Sikorski dated June 17, 2011, which substantiates some of the conduct discussed in the discharge notice.

Had the statements and the remainder of the evidence available to the hospital told the same story as the discharge papers, that Plaintiff's actions exacerbated the psychiatric patient's condition and threatened everyone's safety, as was suggested in her discharge papers, Defendant might have honestly believed Plaintiff's conduct warranted termination. However, in the instant case, Defendant only conducted a brief investigation and obtained Plaintiff's statement and two witnesses' statements, neither of which told the same story and only one of which corroborated the allegations set forth in the discharge papers. Furthermore, the PEERS report summary, which was also available at the time the termination decision was made, did not corroborate

those allegations. This Court should expect that any reasonable employer, faced with this minimal amount of evidence, would conduct further inquiries before proceeding with an adverse employment action. Other witnesses were present during the incident who could have been interviewed, and other records could have been consulted prior to Plaintiff's termination. Instead, Defendants jumped to terminate Plaintiff, claiming that her conduct caused the potential for grave harm to the patient and hospital staff. Although this Court does not require that an employer's investigation be perfect, *see Smith*, 155 F.3d at 807, the circumstances of this case leave one with serious doubts as to whether Defendant could have honestly believed that Plaintiff "performe[d] in a manner that cause[d] grave harm/potential grave harm to the patient or SJMO." (R. 1-8, Discharge Notice, PageID# 46.)

The majority asserts that even if an "open question exists as to whether [Plaintiff's] actions actually exacerbated the psychiatric patient's condition," Maj. Op. at 12, her conduct clearly constituted insubordination sufficient to warrant termination. By so doing, the majority seems to assume that Plaintiff's actions alone violated the hospital's policy and therefore constituted insubordination. There are two problems with this argument.

First, it does not appear that Defendants ever offered "insubordination" alone as the cause of Petitioner's termination. Instead, Defendants proffered reason for Plaintiff's termination was that she "perform[ed] in a manner that cause[d] grave harm/potential grave harm to the patient or SJMO. Ms. Loyd acted outside of her scope of duties . . . [and that] behavior exacerbated the patients [sic] behavior in a negative manner that resulted in the patient attempting to pull I.V. out & required SJMO to place patient in restraints. This is a major infraction violation of the employee discipline policy." (R. 1-8, Discharge Notice, PageID# 46.) In fact, "insubordination" and "performance that causes grave harm/potential grave harm to the patient or SJMO-MO" are listed as separate major infractions in the hospital's discipline policy. (R. 27-6, Employee Discipline Policy, PageID# 390–391.) Because Plaintiff was not terminated for insubordination alone, the majority's assertion that Plaintiff's conduct was sufficient for termination even absent the escalation in the patient's behavior does not hold water.

Second, it is not even clear that Plaintiff's conduct constituted insubordination in this case or that the employer reasonably believed that it did. The majority points to a hospital policy

stating that security guards "shall expect that medical personnel have made an assessment of the situation and adhere[d] to restraint protocols prior to calling the officer." (R. 27-18, Department Authority, PageID# 435.) It is not at all clear that Plaintiff violated the policy or that violation of the policy constituted "insubordination" warranting termination. Although Plaintiff was on final-written-warning status at the time this incident occurred, whether her conduct was accurately described in the witness statements or constituted insubordination warranting her termination is a question appropriately decided by a jury.

Although this Court "do[es] not require that the decisional process used by the employer be optimal or that it left no stone unturned," *Smith*, 155 F.3d at 807, there appears in this case to be a genuine dispute of fact as to whether the hospital honestly believed Plaintiff committed the conduct set forth in her discharge papers and whether her conduct was sufficient to constitute insubordination. On summary judgment, the question is not "whether the court finds that [the employer] made a reasonably informed and considered decision before terminating [the employee]. The proper question is whether a reasonable jury could have concluded that [the employer's] investigation was unworthy of credence." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 288 (6th Cir. 2012) (Tarnow, J., dissenting) (internal quotation marks omitted). Based on the evidence as described above and the unavailability of the full PEERS report, which the district court inappropriately refused to order disclosed, there exists a genuine dispute of material fact regarding whether Defendants' investigation was unworthy of credence.

I would therefore reverse the decisions of the district court admitting the PEERS report summary without also ordering disclosure of the full PEERS report, and granting Defendants' motion for summary judgment, and would remand the case to allow for a jury to properly weigh the evidence.