*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TERESA KARSNEY,

　　　　　Plaintiff-Appellant,

v

CITY OF BURTON, PAULA ZELENKO, and SUE
WARREN,

　　　　　Defendants-Appellees.

UNPUBLISHED
December 21, 2023

No. 364511
Genesee Circuit Court
LC No. 17-110278-NO

Before: BORRELLO, P.J., and SWARTZLE and PATEL, JJ.

PER CURIAM.

Plaintiff appeals as of right the circuit court's opinion and order granting summary disposition to defendants under MCR 2.116(C)(10) on plaintiff's claim for retaliatory discharge under the Whistleblowers' Protection Act (WPA), MCL 15.369 *et seq.* We affirm.

## I. BACKGROUND

Defendant city of Burton (the City) hired plaintiff as city clerk in October 2013. As part of her job duties, plaintiff was required to notarize certain documents. Plaintiff admitted that she knew that she was not to notarize documents unless the persons signing the documents did so in front of her. Further, plaintiff attested in her notary application that she had read the notary laws of Michigan.

In the first several years of her employment, plaintiff did not receive any formal written discipline. But those initial years were not entirely free from conflict. For example, plaintiff had "some issues" with another employee and defendant Sue Warren, the human resources director, spoke to plaintiff about it "a couple times."

Plaintiff also had multiple clashes with the City's mayor, defendant Paula Zelenko. In late 2014, plaintiff reported to several city council members that defendant Zelenko was misappropriating funds by paying another employee from the funds of various department rather than directly from the mayor's office. Plaintiff told defendant Zelenko that it was not appropriate to spread funds across the departments. In response, defendant Zelenko "seemed unhappy" with

-1-

plaintiff. In 2014 and 2016, plaintiff told defendant Zelenko that defendant Zelenko was signing contracts in violation of the City Charter because the contracts did not have the required signatures. Defendant Zelenko denied that the contracts were in violation of the law or indicated she could do what she wanted with them, but did not discipline plaintiff. Defendant Zelenko, again, appeared "displeased" with plaintiff. In May 2016, when plaintiff told defendant Zelenko that she intended to testify at a budget meeting, defendant Zelenko expressed displeasure and scheduled the meeting on a date that she knew plaintiff could not attend. Sometime in 2016 or 2017, plaintiff told defendant Zelenko that she thought it was wrong that defendant Zelenko postdated official documents. Plaintiff was not reprimanded; however, defendant Zelenko "seemed mad" at plaintiff. Finally, sometime in 2016, plaintiff expressed to defendant Zelenko that plaintiff thought it was wrong for defendant Zelenko to carry a handgun without a concealed carry permit. In response, defendant Zelenko "seemed displeased" with plaintiff.

In October 2016, plaintiff received her first formal written discipline after she sent an accusatory e-mail to defendant Zelenko and the entire city council regarding updates to the retirement plan. Plaintiff "requested something in writing" regarding the changes, indicating she had been unable to get answers and asked why the plan was backdated.[1] Ten days later, plaintiff was issued a written "employee warning notice" for "inappropriate behavior," "insubordination," and "violation of . . . procedures." The warning indicated that plaintiff had sent an e-mail that "bypassed the chain of command, misstated the truth and was unprofessional and disrespectful." The warning further stated, "[plaintiff's] actions demonstrated insolence and insubordination." The warning cited several city policies that plaintiff violated.

Approximately nine months later, in July 2017, the Michigan State Police opened an investigation into defendant Zelenko. The investigation was prompted by a complaint filed by a city council member alleging that defendant Zelenko forged and submitted an altered teamsters' union contract and violated her oath of office by not accepting the city council's amendments to the budget. Michigan State Police Detective Sergeant Brian Reece was assigned to the investigation. As part of his investigation, Sergeant Reece visited the city clerk's office on August 8, 2017, where he spoke with plaintiff and made a Freedom of Information Act ("FOIA"), MCL 15.231 *et seq.*, request to plaintiff for the teamsters' union contract. Plaintiff provided the requested document and informed Sergeant Reece that defendant Zelenko's office had initially

---

[1] The full text of plaintiff's e-mail provided:

Paula & City Council:

I would like something in writing from the City of Burton about my retirement. I want to know when the change is taking affect, what the changes are, have I lost my defined benefit completely. I want everything spelled out. I was told that Paula and Mr. Hefner were going to seat [sic] down with me and that didn't happen. I can't get any answers from MERS because they tell me to talk to my employer. Yesterday I was at lunch, I found out that Rachel was asked to sign the contract to set up the Defined contribution plan that was back dated to August 4, 2016. It wasn't even signed until 10/3/2016. Why was it back dated? I have been very patient but I need answers.

retained the document in the mayor's office. Afterwards, plaintiff notified defendant Zelenko via e-mail of the FOIA request. Defendant Zelenko became "very upset" and verbally reprimanded plaintiff for not speaking with defendant Zelenko before responding to the request.

Approximately a month later, on September 20, 2017, a city resident, Michael Domanski, filed a complaint with the Burton Police Department, alleging fraud and forgery with regards to a quitclaim deed (hereinafter, the Domanski investigation). Domanski told Lieutenant Michael Odette that he had entered into a land contract with plaintiff's coemployee, deputy clerk Racheal Boggs, for the sale of property for $1,500. Boggs paid a total of $1,000 to Domanski. When Domanski could not secure the remaining $500 from Boggs, he discovered that Boggs had paid the taxes on the property. He also learned that his signature was forged on a quitclaim deed conveying the property to Boggs, and the deed was filed with the Genesee County Register of Deeds. The signatures on the deed were notarized by plaintiff. Domanski was adamant that he never signed the quit claim deed and that he never appeared at the city clerk's office to have plaintiff notarize the deed.

Two days later, on September 22, 2017, Lieutenant Odette interviewed Boggs. Boggs maintained that the agreed upon price for the land contract was $1,000, which she stated she had paid in full. She asserted that Domanski signed the quitclaim deed the same day that he signed the land contract. Boggs admitted that she had never seen Domanski at city hall. But Boggs could not explain how plaintiff notarized the signatures on the deed when Domanski had never been to city hall. Boggs, who is also a notary, admitted that it was improper to notarize a document if all parties do not sign the document before the notary. During her second interview on September 26, 2017, Boggs admitted that she brought the quitclaim deed to plaintiff, who stamped it and notarized it without all of the parties present. Boggs also admitted that it was common practice in the city's clerk's office to notarize documents without the persons signing the documents in the presence of the notary. She stated that she and plaintiff had notarized documents for each other without following the proper procedures and requirements under the Michigan Notary Public Act, MCL 55.561 *et seq*.

Lieutenant Odette interviewed plaintiff on September 22, 2017. Plaintiff verified that a notary has to positively identify each person signing a document and each person has to sign the document in the notary's presence. When Lieutenant Odette asked if that process was followed in this matter, plaintiff responded, "As far as I know, I don't see why it wouldn't because that's how we do it." When confronted with the fact that Domanski had never been to the clerk's office, plaintiff maintained that she would "never notarize anything without someone in front of [her]." Plaintiff confirmed that all three parties were present in her office and signed the deed in front of her. Upon further questioning, plaintiff backtracked and stated, "I don't know, I honestly don't know what happened." When asked whether this could be one of those instances in which plaintiff notarized a document without all parties present, plaintiff said, "It could be . . . I might have done it as a favor, I don't know." Plaintiff initially denied ever signing any documents improperly as a favor to anyone, but then admitted that this was the first and only time she had ever improperly notarized a document as a favor.

Defendants suspended plaintiff's employment with pay the same day as her interview. Plaintiff was informed of the suspension by a letter signed by defendant Warren. The letter stated that the paid suspension was "[d]ue to a discovery of possible charges of misconduct as discussed

-3-

with you earlier today with Lt. Michael Odette . . . ." The letter indicated that the suspension would be "until further notice pending a further investigation into this matter."

Approximately two months later, defendants directed plaintiff to appear at city hall for an investigative meeting, also known as a *Garrity*[2] hearing. The November 15, 2017 letter, which was signed by defendant Warren, informed plaintiff that "[d]iscipline could be issued based on the totality of the evidence available to the City following this meeting[,]" and further "[if] you refuse to answer questions or otherwise decline to cooperate with the City's investigation discipline may be issued."

Plaintiff participated in the *Garrity* hearing on November 28, 2017. Defendant Warren and the city labor attorney were present. At the outset of the hearing, plaintiff was given a memorandum detailing the nature of the investigation as employment-related only. Plaintiff checked boxes on the memorandum indicating that she understood that her "refusal to answer . . . [a] direct question put to [her] in this meeting will result in [her] discharge," and that plaintiff was "required to tell the truth and [her] failure to do so will result in discipline up to and including termination." Plaintiff declined to answer some of the questions at the hearing. Instead, she simply stated "no comment."

Approximately a week after the *Garrity* hearing, defendants informed plaintiff that her employment was suspended without pay. The December 6, 2017 letter, which was signed by defendant Warren, stated in pertinent part:

> The city has decided to place you on unpaid leave status because its investigation into the allegations against you confirms you engaged in the alleged misconduct. This conclusion has been made after a review of all available evidence. This includes, but is by no means limited to, the admittedly common knowledge that a notary's chief responsibility is to ensure the authenticity of signatures. Your claim to have been unaware of this is not worthy of credence and the City finds you were not truthful during your investigatory interview on November 28, 2017.
>
> Indeed, the application to become a notary contains a statement affirming, under penalty of perjury, that you have carefully read the notary laws of the State of Michigan. Michigan law requires the same. . . .
>
> Additionally, the City has filed a complaint with the Secretary of State regarding your misconduct and breach of the public's trust. As a result of your misconduct, your notary certification will likely be revoked. You may also be subject to a civil fine of up to $1,000.00 and [be] required to reimburse the Secretary of State for the cost of any required investigation.

---

[2] *Garrity v New Jersey*, 385 US 493, 500; 87 S Ct 616; 17 L Ed 2d 562 (1967). "[A] *Garrity* hearing allows the interviewee to answer questions with the knowledge that any statements elicited therein will not be used against him in criminal proceedings." *People v Brown*, 279 Mich App 116, 142; 755 NW2d 664 (2008) (cleaned up).

Your misconduct in office could have serious ramifications for the City. . . . Moreover, you were expressly warned that your failure to be truthful during your investigatory interview would be independent grounds for termination.

Although the city believes immediate discharge is appropriate, a final determination as to your continued employment will be made after all relevant information can be reviewed. This includes, for instance, any criminal charges, civil penalties, and/or FOIA'd records as of yet outstanding.

During plaintiff's unpaid suspension, several city employees and Lieutenant Odette allegedly pressured the prosecutor to bring charges against plaintiff.[3] In June 2018, the prosecutor filed a criminal charge against plaintiff for violation of the Notary Public Act.

Thereafter, defendant City informed plaintiff that her employment with defendant City was terminated. The June 13, 2018 letter, signed by defendant Warren, stated in pertinent part:

As you are aware, the Office of the Great Seal has determined you violated the notary act and has suspended your notary license. As a direct result and in accordance with the official Charter of the City of Burton . . . , the position of City Clerk has been automatically vacated. Therefore, effective immediately, your employment with the City of Burton has ended.

You are also facing felony charges regarding this same issue and have been ordered by the court to cease any contact with the Clerk's Office. In the event any criminal conviction results from these charges, your employment would also be automatically terminated by operation of . . . [the] Charter . . . .[4]

Four months after the termination of her employment, plaintiff pleaded *nolo contendere* to the criminal charges in October 2018.

Plaintiff filed a complaint against defendants alleging violations of the WPA. Plaintiff alleged that she engaged in various protected activities and that she suffered adverse employment events, including an unpaid suspension and ultimately her termination, because she engaged in these protected activities.[5]

---

[3] The city employees who allegedly engaged in this behavior are not parties in this case.

[4] Plaintiff disputed that the Office of the Great Seal determined that she had violated the notary act. Instead, plaintiff testified in her deposition that she requested the Office of the Great Seal to suspend her notary license because one of her notary stamps was missing when she received her personal items from defendants.

[5] Plaintiff filed a first amended complaint that included a claim for wrongful discharge in violation of public policy, but she voluntarily withdrew that claim after defendants moved for summary disposition.

Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not establish a prima facie violation of the WPA. Defendants asserted they had legitimate, nondiscriminatory business reasons for the adverse employment decisions, and plaintiff could not establish that these reasons were pretext for retaliation. Plaintiff countered that pretext was not relevant because direct evidence of retaliation required that the matter be submitted to a jury. Plaintiff asserted that the direct evidence included that defendant Zelenko knew of the protected activity, the adverse employment decision occurred within weeks, and defendant Zelenko expressed displeasure. Plaintiff added, nonetheless, that defendants' alleged legitimate business reasons were pretext because Boggs was treated differently for the same behavior.

After a hearing on the motion, the trial court granted summary disposition to defendants under MCR 2.116(C)(10). In its analysis, the court presumed that plaintiff had established a prima facie case of retaliation, but concluded that plaintiff could not prevail because she could not establish pretext. With respect to plaintiff's termination, the court found that defendants' decision was justified and had a basis in fact, and plaintiff had not presented any countervailing evidence. For the same reasons, the court found that plaintiff could not establish pretext for the earlier suspension without pay. The court found that "Burton's reasons have a basis in fact, they clearly were the actual reasons for suspension, and outright forgery of a deed being tolerated by the Clerk of the City of Burton to benefit a friend and fellow employee in a disputed real estate transaction loudly falls short of being insufficient to terminate. No reasonable juror would find otherwise on these points." Plaintiff now appeals.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). When reviewing a motion for summary disposition under MCR 2.116(C)(10), a trial court must consider the evidence submitted by the parties in the light most favorable to the non-moving party and may only grant the motion if there is no genuine issue of material fact. *Id*. at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (cleaned up). But "[t]he court is not permitted to assess credibility, or to determine facts" in analyzing whether a genuine issue of material fact exists. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). "Instead, the court's task is to review the record evidence, and all reasonable inferences therefrom, and decide whether a genuine issue of any material fact exists to warrant a trial." *Id*.

## III. ANALYSIS

An action for retaliatory discharge in violation of the WPA is governed by MCL 15.362:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is

requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Under this provision, a plaintiff may establish a prima facie violation of the WPA "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (cleaned up). "The plain language of the statute provides protection for two types of 'whistleblowers': (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action." *Henry v Detroit*, 234 Mich App 405, 409; 594 NW2d 107 (1999). As this Court explained:

> On the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. In other words, we see type 1 whistleblowers as initiators, as opposed to type 2 whistleblowers who participate in a previously initiated investigation or hearing at the behest of a public body. If a plaintiff falls under either category, then that plaintiff is engaged in a "protected activity" for purposes of presenting a prima facie case. [*Id.* at 410.]

With respect to causation, "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation[.]" *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003).

A plaintiff may rely on direct or indirect evidence to establish a prima facie violation of the WPA. *Debano-Griffin*, 493 Mich at 176. "Direct evidence" is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). "Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin*, 493 Mich at 176. When a plaintiff relies on indirect evidence, the burden-shifting analysis of *McDonnell Douglas*[6] applies. *Hazle*, 464 Mich 462-463. "A plaintiff may present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful retaliation." *Debano-Griffin*, 493 Mich at 176 (cleaned up). Once a plaintiff establishes a prima facie case under this standard, a presumption of retaliation arises. *Id.* The burden then shifts to the employer to rebut this presumption by offering "a legitimate reason for its action . . . ." *Id.* If the employer offers such a reason, the burden shifts back to the plaintiff to "show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action" in order to avoid summary disposition. *Id.*

---

[6] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

"[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful retaliation]." *Id.* (cleaned up). A plaintiff can establish that the employer's articulated reasons are pretexts "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *McNeill-Marks v MidMich Med Ctr-Gratiot*, 316 Mich App 1, 18; 891 NW2d 528 (2016). But "[t]he fact that a plaintiff engages in a "protected activity" under the Whistleblowers' Protection Act does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *West*, 469 Mich at 187.

## A. DIRECT EVIDENCE

Plaintiff first argues that the trial court erred by applying the burden-shifting framework of *McDonnell Douglas* because direct evidence supports that plaintiff's engagement in protected activities caused defendants' adverse employment decisions. We disagree.

Plaintiff maintains that an alleged admission in defendants' summary disposition brief is direct evidence of causation. Specifically, plaintiff quotes the following statement: "Defendants placed Plaintiff on an unpaid suspension **BECAUSE OF** her failure to provide truthful [Plaintiff Karsney denies this] and accurate information during the investigatory interview with Ms. Warren and the City's labor attorney." (Emphasis and alterations added by plaintiff.)

Plaintiff misconstrues this statement. "Direct evidence" is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle*, 464 Mich at 462. Applying that principle here, it cannot be reasonably concluded that defendants suspended plaintiff without pay after the *Garrity* hearing because she participated in the hearing or because she reported a violation of law at the hearing. Rather, defendants put plaintiff on unpaid suspension because defendants believed that plaintiff was untruthful in her statements at the *Garrity* hearing. The statement does not provide direct evidence that plaintiff was suspended without pay because she engaged in protected activity. Accordingly, we conclude that the trial court did not err by applying the burden-shifting framework of *McDonnell Douglas*.[7]

## B. PRETEXT

Plaintiff further asserts that the trial court erred by concluding that she failed to establish that defendants' alleged legitimate business reasons for its adverse employment actions were pretext. We disagree.

---

[7] Plaintiff argues for the first time on appeal that a reprimand on the same day as the protected activity is direct evidence of causation. Because plaintiff did not raise these facts as direct evidence in the trial court, this claim is waived. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___NW2d___ (2023) (Docket No. 359090); slip op at 3 (holding that a party waives a claim of error that the party did not properly preserve by bringing the issue to the trial court's attention).

Plaintiff first asserts that defendant's adverse employment decisions have no basis in fact because, accepting the evidence in a light most favorable to plaintiff, Boggs forged plaintiff's notarization on the deed. Plaintiff's position disregards her own admissions and testimony. Plaintiff told Lieutenant Odette that she stamped the deed as a favor. And in her deposition testimony, plaintiff admitted that she notarized the deed, stating, "I never said I didn't notarize it." On appeal, plaintiff references her affidavit, but she does not attest in her affidavit that she did not stamp the deed. Plaintiff further argues that no one saw plaintiff notarize the deed and Boggs had a motive to notarize the deed. But it cannot be reasonably inferred from these facts that plaintiff did not stamp the deed herself. Such an inference is speculative and insufficient to create a genuine issue of material fact. See *Kaminski v Grand Trunk Western R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956) (indicating evidence is speculative when it merely provides an explanation consistent with known facts and does not provide a reasonable factual basis from which to make logical inferences).

We find that the record establishes a factual basis to support defendants' business decision. Defendants suspended plaintiff with pay based on suspected misconduct that was factually supported by the police investigation. Defendants suspended plaintiff without pay because she violated the notary laws and her claim that she did not know the presence of all signors was required was not credible. And defendants terminated plaintiff's employment because she had been charged with a felony and the Office of the Great Seal had revoked her notary license. Accordingly, we conclude that plaintiff failed to demonstrate a genuine issue of material fact that defendants' adverse employment decisions had "no basis in fact."

Plaintiff further argues that pretext exists because even if defendants' legitimate business reasons were true, the grounds were not enough to terminate plaintiff's employment. In support, plaintiff asserts that defendant Zelenko often ordered plaintiff to notarize documents in the absence of signors and that Boggs engaged in the same behavior, but was not fired. However, the forged deed at issue that led to plaintiff's paid suspension, unpaid suspension, and ultimate termination was not a document that defendant Zelenko asked plaintiff to notarize; it was a document allegedly signed by a private citizen that plaintiff notarized as a favor for a fellow employee, not defendant Zelenko. Further, the complaint related to the forged deed that led to defendant's adverse employment decisions was not initiated by defendants; it originated with a private citizen. Plaintiff's act of notarizing the deed against protocol in this instance led to criminal charges and revocation of her notary license, unlike the instances in which defendant Zelenko requested plaintiff to notarize documents against protocol. Even assuming Boggs engaged in the same behavior as plaintiff, Boggs' situation was otherwise dissimilar to plaintiff's. Indeed, Boggs was not charged with any crime related to her conduct and her employment was not terminated. But Boggs suffered adverse employment actions. Boggs was initially suspended with pay and then she was suspended without pay for her conduct related to the Domanski investigation. Unlike plaintiff, Boggs was a union employee, so a union representative ultimately negotiated Boggs' reinstatement. Boggs' dissimilar treatment does not suggest that plaintiff's termination was not justified.

Finally, plaintiff asserts that the highly unusual circumstances of this case, in which multiple city employees pressured the prosecutor to bring criminal charges against plaintiff, demonstrates pretext and requires submission of this matter to a jury. The most that can be inferred from these circumstances is that these employees wanted plaintiff to be charged with a crime.

These motivations cannot reasonably be attributed to defendants without some other indication on the record. Moreover, plaintiff has not cited any authority that such "unusual activity" from employees not involved in reprimanding plaintiff is sufficient to demonstrate pretext.[8]

We find that plaintiff has failed to establish that a genuine issue of material fact exists that defendants' legitimate business reasons for its adverse employment decisions were pretexts. Accordingly, the trial court did not err by granting summary disposition in favor of defendants.[9]

Affirmed.

/s/ Stephen L. Borrello
/s/ Brock A. Swartzle
/s/ Sima G. Patel

---

[8] Relatedly, plaintiff argues that the trial court erred by adopting the federal "honest belief rule," wherein "[a]s long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger v Cincinnati Bell Tel Co*, 681 F3d 274, 285-286 (CA 6, 2012) (cleaned up). Thus, the falsity of an employer's proffered legitimate business reason cannot establish pretext as a matter of law. *Id*. at 285. But plaintiff fails to identify any portion of the trial court's opinion that reflects that it adopted this principle. In fact, there is no federal authority cited in the trial court's opinion, nor was the honest belief rule discussed by the trial court.

[9] Because our analysis necessarily presumes that plaintiff established a prima facie case of retaliation, it is not necessary for us to consider the remainder of plaintiff's arguments.